513 P.2d 220 (1973)
George T. BATOR, Plaintiff-Appellee, and Cross-Appellant,
v.
MINES DEVELOPMENT, INC., Defendant-Appellant and Cross-Appellee, and
Susquehanna Western, Inc., and the Susquehanna Corporation, Defendants-Appellants.
No. 72-055.
Colorado Court of Appeals, Div. II.
June 5, 1973.
Rehearing Denied June 26, 1973.
*222 Van Cise, Freeman, Tooley & McLearn, Edwin P. Van Cise, Denver, for plaintiff-appellee and cross-appellant.
Helmick, Conover & Burkhardt, Walter I. Auran, John B. Moorhead, Denver, for defendants-appellants and cross-appellee.
Selected for Official Publication.
PIERCE, Judge.
George Bator brought this action against the Susquehanna Corporation (Susquehanna) and two of its subsidiaries, Mines Development, Inc., (Mines) and Susquehanna-Western, Inc. (Western). Bator contended that Mines had breached his employment contract by discharging him without *223 cause. The claim against Susquehanna and Western was for recovery in quantum meruit for services Bator allegedly rendered the two corporations.
This dispute has a long and involved history. In 1954, Bator and Allen Grey formed the Mines corporation with the intention of constructing a uranium mill in Edgemont, South Dakota. In order to finance their venture, they transferred all the stock to a financier, Mr. Carmack, in return for employment contracts that provided them with compensation based on a percentage of the corporation's net income. Carmack subsequently transferred all the Mines stock to Susquehanna, making Mines a wholly-owned subsidiary of Susquehanna. Thereafter, Grey negotiated new employment contracts with the new Mines management team for himself and for Bator.
Mines opened operations under a contract with the Atomic Energy Commission. Bator's contract was to "be in force and effect for the term of the contract between Mines and the Atomic Energy Commission" and provided that he was to "at all times conduct the operations of Mines and render services . . . under the general supervision and direction of the Board of Directors or chief executive officers of Mines, and in a manner which will further the best interests of Mines." He was "to devote such of his time and attention to the business and affairs of Mines as shall from time to time be requested of him by the Board of Directors and the chief executive officers of Mines." By the terms of the contract, he could only be discharged for cause.
Once the mill at Edgemont was in operation, there was little for Bator to do. Thereafter, the management at Susquehanna began plans for another mill to be constructed in the Riverton, Wyoming, area by another wholly-owned subsidiary, Western. Eventually, a contract with the Atomic Energy Commission was secured by Western. This mill and a sulfuric acid plant at the same location, both Western enterprises, were put into operation only after considerable contribution of services by Bator. Although Bator was not under contract with Susquehanna or Western for the services rendered at Riverton, there were indications from the then management of Susquehanna that he would be compensated for his efforts.
As the result of a proxy fight, control of Susquehanna changed in 1958. New management attempted to purchase from Grey and Bator their contracts with Mines. Only Grey accepted. Thereafter, Bator was asked to do less and less. Finally, effective March 1, 1960, Bator was discharged from Mines on the grounds that he was engaged in operations with another corporation interested in milling uranium, which, according to Susquehanna officials, were contrary to the best interest of Mines.
By this action, Bator contended that he was discharged without cause from his employment with Mines, contrary to the terms of the contract. He sought an accounting from Mines for moneys due him under the contract, both for his last year on the job and for the subsequent years that Mines continued to mill in Edgemont under the initial Atomic Energy Commission contract and its subsequent renewals. The quantum meruit claim against Susquehanna and Western was based on the services rendered to Susquehanna and Western that resulted in making the Riverton mill operational.
The matter was tried to the court, and judgment was entered in favor of Bator on both counts. Since payment under Bator's contract with Mines was to be based upon a percentage of the net income of the corporation, and since the parties could not agree on an accounting method, it became necessary, subsequent to the hearing on liability, to have a hearing on the accounting methods to be employed in arriving at the net income figure. From the two hearings extensive findings of facts and conclusions of law were filed by the court, and judgment was entered thereon.
Susquehanna and Western appeal from the judgment entered on Bator's quantum *224 meruit claim. Mines appeals from the determination that Bator's contract was breached, contending that he was discharged for cause pursuant to the terms of the contract. Mines further contends that even if he were not discharged for cause, the AEC contract expired in 1962 and Bator was not entitled to any compensation under a new contract that Mines had with the AEC, which contract was allegedly materially different. Bator cross-appeals, contending that the court erred in the accounting phase of the trial by allowing certain deductions from corporate gross income, thereby reducing the income payable to him.

LIABILITY

I.
We turn first to the contention of appellants Susquehanna and Western, that the evidence will not support a recovery under quantum meruit. The basis of this contention is the allegation that Bator was a volunteer during the time he was performing services in the Riverton area and did not anticipate payment. The trial court, however, concluded that Bator performed the alleged services at the request of and for the benefit of the corporations, and that both he and management anticipated compensation for the services rendered.
Recovery in quantum meruit is based upon the principle that services rendered under circumstances where compensation is reasonably expected should be paid for. Kellogg v. Gleeson, 27 Wash.2d 501, 178 P.2d 969. The intention to pay and the expectation to be paid, can be reasonably inferred from the circumstances. Bean v. Wilson, 120 Cal.App.2d 58, 260 P.2d 134. Thus, it is ultimately a question of fact as to whether a claim in quantum meruit has been established. Payne v. Bank of America National Trust & Savings Ass'n, 128 Cal.App.2d 295, 275 P.2d 128. Here, there was adequate evidence to support the trial court's determination that Bator was acting at the insistence of officers of the corporation, not as a volunteer, and that both parties anticipated a payment of compensation. We will not, therefore, disturb the findings on appeal. Larson v. American National Bank, 174 Colo. 424, 484 P.2d 1230.

II.
We turn next to appellant Mines' contention that Bator was discharged for cause, and that, therefore, he was not entitled to an accounting for the disputed years. The contention has two facets. It is first argued that Bator breached his employment contract with Mines by failing to give an opportunity of first refusal to Susquehanna on a business venture in which Bator became interested. Alternatively, it is argued that even if the terms of the contract were not breached, Bator breached his fiduciary duty to Mines by taking a corporate opportunity unto himself.
The same factual incident is offered as support for both contentions. Specifically, in late 1959 Bator involved himself with a business entity known as Golden Enterprise Corporation to develop a uranium ore property. It was intended that a uranium mill be located at a site in Wyoming. Mines contends that by so pursuing his personal interests, Bator was guilty of misconduct, contrary to the best interest of Mines and that thus, he could be discharged.
From these facts, the court made the following conclusions. With regard to the contract the court determined that by its terms, Bator was only to devote such of his time and attention to the business of Mines as was requested of him, and that he had in fact, done all that was requested of him. As to a breach of fiduciary duty, the court concluded that while Bator's personal self-dealing was not in the best interest of Susquehanna or Western, it was totally unconnected with Mines. We affirm the trial court on both counts.
Turning first to the contract, Mines contends that Bator had a duty to do more than just what was requested of him. It is contended that a letter addressed to Bator from the president of Susquehanna on the *225 day the contract was executed contained certain terms which were incorporated into the contract. This letter advised Bator that he was free to pursue any interest on behalf of himself so long as he informed Susquehanna of every such opportunity and gave it the first right of refusal. When Bator received this letter, the contract had been executed. The question is essentially one of determining whether Bator agreed to the terms stated in the letter. It is axiomatic that a court cannot remake a contract for the parties, adding terms that are not contained therein. Yamin v. Levine, 120 Colo. 35, 206 P.2d 596. Rather, it is the court's duty to ascertain the intent of the parties from the terms of the contract, Coulter v. Anderson, 144 Colo. 402, 357 P.2d 76, and courts should be hesitant to imply any conditions or terms into a contract which result in a breach. T. D. Dennis Builder, Inc. v. Goff, 101 Ariz. 211, 418 P.2d 367. Here, there was no evidence to establish that this letter was in fact, to be incorporated into the executed agreement, or that its terms were intended by Bator to be part of his performance or were in fact, accepted by him.
Furthermore, the trial court concluded that Bator had done all that was required of him by the contract. Determination of whether a party has performed under a contract is ultimately a question of fact. Little Thompson Water Ass'n v. Strawn, 171 Colo. 295, 466 P.2d 915. Here, the facts support a determination that Bator did all that was requested of him under the terms of the instrument. This being the case, the determination will not be reversed on appeal.
Similarly, we do not think that the evidence would support a finding that Bator breached any fiduciary duty owed to Mines. Appellants established that Bator, as an officer of Mines and a member of the management team of Susquehanna, owed a fiduciary duty to both Susquehanna and Western. The trial court concurred with them in this position. Furthermore, it cannot be disputed that he, as an officer, owed a fiduciary duty to Mines. Hudson v. American Founders Life Insurance Co., 151 Colo. 54, 377 P.2d 391. The question though is not whether he owes these duties to the corporations involved, but rather, whether such duties were breached.
The crucial determination to be made by the trial court in determining whether Bator breached his fiduciary duty was whether the Golden Enterprise venture was an opportunity within the expectation of Mines. Lincoln Stores, Inc. v. Grant, 309 Mass. 417, 34 N.E.2d 704. The undisputed evidence shows that although the venture did concern a potential mill site, such venture would not have been within the expectations of Mines. It was apparent to all persons concerned in these various enterprises that Mines would not have acquired any new opportunities because of several undesirable contracts, including Bator's, which diminished net income to the firm. This being so, all new opportunities were being acquired by other Susquehanna enterprises. The determination of whether a duty was breached was a question of fact for the trier of fact. Johnston v. Greene, 35 Del.Ch. 479, 121 A.2d 919. The court concluded from these facts that no duty was breached to Mines. The record supports this conclusion.

III.
Having determined that Bator was not discharged for cause, we turn to Mines' contention that any obligation to Bator ended in 1962 when the initial contract between Mines and the AEC was terminated, and the new contract negotiated. The basis of this contention is the following language in Bator's employment contract:
"This contract shall commence as of January 1, 1955, and shall be in force and effect for the term of the contract between Mines and the Atomic Energy Commission . . . or any extension or renewal thereof on the same terms and conditions as the present contract."
*226 The trial court concluded that the new AEC contract was substantially the same as the old, and interpreted this provision of the employment contract to mean that Bator was to be paid "so long as the milling operation continues no matter what the provisions of the AEC contract."
Although we do not agree that Bator has an unconditional right to be paid regardless of the terms of the AEC contract, we do agree that the terms of the new contract were substantially the same as the old, and that therefore, Bator was entitled to the agreed percentage of net profits for the duration of this new contract and any extensions that are similar.
Mines contends that this result cannot be reached. Much is made of the fact that the language of Bator's contract provided that it was to continue in existence only through any extensions or renewals and that the subsequent negotiations resulted in termination of one contract and execution of another. We are not governed by the labels Mines attached to the documents. Kintner v. Wolfe, 102 Ariz. 164, 426 P.2d 798. Rather, we are guided by the rule that we must find a fair and reasonable interpretation of the instruments. Hutchinson v. Elder, 140 Colo. 379, 344 P.2d 1090. Here, it would be unreasonable to determine that there was any significant difference in the two AEC contracts, and therefore, unreasonable to deny recovery on the technicality of the terms used in the new negotiations. Furthermore, this very clause in the employment contract was designed to protect Bator in the event that Mines negotiated changes in the AEC contract. As such, we will construe it in his favor. Christmas v. Cooley, 158 Colo. 297, 406 P.2d 333. We conclude that the terms of his contract were broad enough to continue his right to receive a percentage of net income even if a new AEC contract were negotiated, so long as the new contract was not materially different from the earlier one.

ACCOUNTING

I.
At the conclusion of the liability hearing, Mines was directed to submit an accounting covering the disputed years. This order also gave Bator the option of filing an opposing accounting.
Mines submitted an accounting and Bator objected, citing six specific exceptions. These exceptions were directed to certain deductions taken by Mines from net income. Since Bator's contract was based on a percentage of net income, these deductions had the effect of reducing his income.
After a hearing on the matter, the court entered judgment denying five of the six exceptions. Only Bator appeals from this aspect of the trial, claiming error as to four of the alleged wrongful deductions. We agree with Bator that the judgment against Mines should be increased by disallowing three of the four disputed deductions.
We first note that since we are dealing with the interpretation of written documents, Bator's contract in which the items to be deducted in determining his share of income were designated, and the accounting documents which were stipulated to contain correct figures, we are not bound by the trial court's construction of those documents. Meier v. Denver U.S. National Bank, 164 Colo. 25, 431 P.2d 1019.
First, Bator claims that there was an excess deduction for salaries. The trial court determined that Bator failed to prove that these deductions were unreasonable. We agree. Mines contended that the disputed deductions not only included salaries, but other reasonable administrative costs. Since his contract would allow the deduction of reasonable administrative costs, once the question of the reasonableness of these costs was raised, Bator had the burden of establishing their unreasonableness. He put on no evidence to establish a violation of his contract in this regard. Therefore, the deduction was properly allowed.
*227 The next two proposed deductions essentially arise out of the same transaction. As indicated earlier when Bator and Grey formed the original Mines company, they enlisted the aid of Mr. Carmack to finance the operations, eventually transferring all of the capital stock to him. Thereafter, Susquehanna, through a subsidiary, purchased all of Carmack's stock. Carmack was to be paid, in addition to a cash down payment, a percentage of the income of Mines until the received the balance of total contract price. The questions presented are, first, how to treat the annual payments to him under the agreement; and second, whether the original down payment can be amortized and deducted as a reasonable depreciation expense. We conclude, contrary to the findings of the trial court, that neither can be deducted from net income under the terms of Bator's contract.
Mines argues that these items are properly deducted, since they can be deducted for income tax purposes, and since such deductions are acceptable under sound accounting principles. However, in this matter, we are not governed by what is a customary accounting practice or by what is allowable for income tax purposes. We are instead governed by the terms of Bator's employment contract. While the contract does provide that guidance in determining allowable deductions can be gained from referring to the income tax law, no specific term deals with the initial transaction involving Carmack. The lack of provision regarding this issue has been an annual subject of dispute between the parties throughout the entire life of this contract. The matter was resolved through negotiations between Bator and the corporation in the years 1956, 1957, and 1958 by disallowing this deduction. Thereafter, in 1959 and the subsequent years, while the parties have been engaged in this bitter dispute, the Susquehanna management has insisted on deducting these amounts. Because there is ambiguity in the contract as to how this matter was to be treated, we must turn to the conduct of the parties with regard to their agreement. The fact that they agreed on disallowing these deductions while Bator was in good grace with management established a course of performance which determined their intent. Nahring v. Denver, 174 Colo. 548, 484 P.2d 1235. Therefore, we conclude that these deductions should have been disallowed.
Finally, Bator contends that certain administrative charges of the Chicago office of Susquehanna were wrongfully deducted from Mines' net income. We agree. The trial court ruled that plaintiff had not sustained his burden in proving that the administrative expenses were unreasonable. However, the evidence clearly established that certain expenses of the parent corporation were being deducted from Mines' net income. By the pertinent terms of the contract before us, which here are unambiguous, only normal operating and maintenance expenses of the Mines' operation were to be allowed as deductions. Again, the fact that this was perhaps good accounting practice within the context of parent-subsidiary relations is unpersuasive since we are controlled by the provisions of this contract. These items should not have been allowed as deductions.
The deductions for administrative expenses of the Chicago office, and for both aspects of the Carmack transaction are disallowed, and the matter is remanded to the trial court for amendment of judgment consistent with this opinion. The judgment is affirmed in all other particulars.
Judgment affirmed in part, reversed in part and remanded with directions.
SILVERSTEIN, C. J., and DWYER, J., concur.