455 F.Supp. 147 (1978)
Clifton WADE and Jean Wade, Plaintiffs,
v.
FORD MOTOR CREDIT COMPANY, a corporation, Defendant.
No. 77-529C(B).
United States District Court, E. D. Missouri, E. D.
June 2, 1978.
*148 Thomas B. Hayes, Jr., St. Louis, Mo., for plaintiffs.
Gerald T. Hoff, St. Louis, Mo., for defendant.

MEMORANDUM
REGAN, District Judge.
This matter is before the Court on motion of defendant for summary judgment on *149 each count of the amended complaint. Originally, there were two counts, but by their amended complaint, plaintiffs (husband and wife) added a third count.
Count I seeks recovery of actual and punitive damages on the allegation that defendant, "in violation of the agreement between Plaintiffs and Defendant," wrongfully repossessed a 1975 Ford automobile, the purchase of which had been financed by defendant. By the terms of the retail installment contract (assigned to defendant) a security interest on the automobile was held by defendant. The contract provided for monthly payments of $167.41 on the 5th day of each month commencing April 5, 1975.
Under the caption "Default" the contract provided, in part,
"Time is of the essence of this contract. In the event Buyer defaults in any payment . . . Seller[1] shall have the right to declare all amounts due or to become due hereunder to be immediately due and payable and Seller shall have all the rights and remedies of a Secured Party under the Uniform Commercial Code, including the right to repossess the Property wherever the same may be found[2] . . .. Waiver by Seller of any default shall not be deemed a waiver of any other default."
The contract also contained a provision obligating the Buyer to pay a delinquency charge on each installment in default for more than 10 days in the amount of 5% thereof or $5.00 whichever is less, plus collection expenses.[3]
On a number of occasions, plaintiffs were late in making their installment payments, but usually avoided payment of a delinquency charge by paying the installment in default with 10 days after it was due. However, defendant constantly reminded plaintiffs of their delinquency and "threatened" them that if payments were not timely made the car could and would be repossessed.
The retail installment contract contains the only agreement between the parties, either oral or written. It is clear from that contract that defendant had the right to repossess the automobile in the event of default in any payment. It is also beyond dispute that as of November 3, 1976, when defendant repossessed the automobile, plaintiffs were in default of the October 5, 1976 installment payment. The mere fact, if so, that several hours before the repossession was effected, plaintiffs (without the knowledge of or notice to defendant) placed a check in the mail addressed by certified mail to defendant does not constitute payment of the delinquent installment, inasmuch as the check was not received until after the repossession. In these circumstances, there is no genuine issue as to the fact of plaintiffs' default.
The facts do not support a theory of waiver of defendant's right to repossess. It is, of course, true that plaintiffs were frequently, if not habitually, late in making their installment payments and that the acceptance of such payments may have constituted a waiver as to those defaults. However, the acceptance of prior late payments did not constitute a waiver of defendant's right to prompt payment of the October 5, 1976 installment. As noted supra, the agreement specifically provides that "(w)aiver by Seller of any default shall not be deemed a waiver of any other default." There is no factual claim that any other conduct or any statements by defendant's agents could have misled plaintiffs, particularly when note is taken of defendant's continual reminders to plaintiffs that their car would be repossessed if they did not make payments in a more timely manner.
*150 Waiver is the intentional relinquishment of a known right. Under the facts here involved, there is absolutely no basis for any contention that defendant ever intended to relinquish its right to repossess by its past acceptance of installments in default, nor, for that matter that plaintiffs could reasonably have believed that defendant would not at some time carry out its "threat" to repossess.
As noted in Lange v. Midwest Motor Securities Co., Mo.App. 1921, 231 S.W. 272, 274:
"The fact that previous installments were accepted after they were in default may be a waiver of the right to declare the entire indebtedness due for those defaults, but such fact will not constitute a waiver as to a default thereafter which was not waived."
See also B-W Acceptance Corporation v. Alexander, Mo. banc 1973, 494 S.W.2d 75, 79 to the same effect.
Plaintiffs' reliance on Edwards v. Smith, Mo.1959, 322 S.W.2d 770 is misplaced. In that case, a note holder was held liable in damages for a wrongful foreclosure of a deed of trust on real estate because the note holder had made a specific agreement to permit irregular and late payments, coupled with an agreement not to foreclose without first notifying the debtor. No such facts are here present.
It follows from the foregoing that defendant's repossession of the 1975 Ford automobile was neither wrongful nor in violation of the agreement between the parties. Hence, defendant's motion for summary judgment on Count I of the amended complaint should be and it is hereby sustained.
Count II, "in the alternative to Count I," alleges that defendant converted the 1975 Ford automobile by taking it without right. It is premised on the theory that plaintiffs were entitled to the immediate possession of the automobile.
Conversion is, of course, concerned with possession. "(I)n the nature of things [it] cannot spring from the exercise of a legal right." 89 C.J.S. Trover & Conversion § 3, p. 533. As plaintiffs concede, the basis of Count II is that defendant wrongfully repossessed the automobile. However, as we have noted, supra, defendant was acting in accord with its contractual right to take possession of the automobile by reason of plaintiffs' default in making the October 5 payment. There is no question but that plaintiffs were given ample opportunity to redeem the car prior to its ultimate sale. In this situation, plaintiffs' conversion count falls with Count I. Defendant is entitled to summary judgment on Count II and accordingly, its motion for summary judgment as to Count II should be and it is hereby sustained.
Count III (which was added in the amended complaint, also as an "alternative to Count I") proceeds on the theory that defendant was guilty of oppressive collection tactics which caused plaintiffs to suffer great mental anguish, embarrassment and humiliation. As pleaded, the Count alleges the following as the basis of the claim:
"In an attempt to collect an indebtness (sic), Defendant Ford Motor Credit Corporation adopted a course of deliberate harassment designed to embarrass, humiliate, and subject Plaintiffs to opprobrium resulting in and causing Plaintiffs and their family mental anguish. During this course of time beginning sometime after February 17, 1975, and continuing up until November 3, 1976, Defendants, acting by and through its agents and servants, telephoned them, humiliated them to their children, and bullied and harassed them for the collection of this indebtedness."
In an effort to obtain the specifics of the claim, defendant submitted interrogatories to plaintiffs which were answered, not by plaintiffs as Rule 33, F.R.C.P. requires, but by their attorney and agent "to the best of his knowledge, information and belief."[4] Interrogatory 12 requested plaintiffs to set forth (a) each of the "threats" complained *151 of, (b) the words and actions allegedly used to humiliate them in front of their children, and (c) a general description of the words and actions complained of as having "bullied and harassed" them. The Answer consisted mostly of generalities. We quote:
"a. Plaintiffs are unable to set forth exactly each of the threats of which they complain, however, generally they were threats of repossession, threats that plaintiffs and their family would be walking, threats that one or both of plaintiffs would be jailed."
b. Plaintiffs are unable to set forth exactly what words and actions were used, however, generally they were phone calls to the family home wherein demands for payment were made to the children and wherein the above threats were made to the child answering the phone. Additionally, representatives of defendant came to plaintiffs' home and argued with them in front of their children; additionally representatives of defendant laughed at plaintiff, Jean Wade, when she visited the office of defendant with her daughter.
c. The above plus a phone call at work to plaintiff Clifton Wade by defendant after the repossession wherein plaintiff was asked how he was getting home."
In answer to questions as to whether, and if so where, when, and how any employee of defendant confronted plaintiffs personally in a public place, the Answer stated that plaintiffs were "uncertain of date," but that it was approximately summer of 1973 or 1974, and that the confrontation consisted of "loud talking and yelling at us through our front door regarding payment, but we "don't remember exact words." The Answer further concedes that defendant's employees never cursed or swore at plaintiffs or any member of their household.
It is to be noted that not only are the answers for the most part conclusory in nature and lacking in specifies, but that at least part of the answers relate to an incident prior to the period from February 17, 1975 to November 3, 1976, the time period alleged in Count III.
Plaintiffs' depositions are on file. Plaintiff Jean Wade testified that she was never contacted by a representative of defendant respecting the 1975 Ford (which was purchased February 17, 1975) but that she called defendant once concerning a payment alleged to have been late. She recalled that her husband had been called six or seven times by an agent of defendant and he was once told that "if he didn't get the payment in right away we will be walking in the street."
Clifton Wade testified that "at least once every month" (about 5 or 6 times in all) he would receive telephone calls at his job "in regard to my payments on the car," each such call being about 5 days after the payment was due, and that when he (Wade) "explained" about the grace period, he was told there was no grace period, that the payment was due on the 5th of the month and that is when defendant wanted it. He further testified that each of his daughters talked to representatives of defendant three or four times when they answered the phone. In each instance, a message was left that if the payment wasn't in by a certain time, the car would be repossessed and the plaintiffs "would be walking." However, the testimony leaves it uncertain as to whether these calls were after February 17, 1975, in view of the fact that the Wades had an unlisted number which they changed (without notifying defendant) after February.
In opposition to the motion for summary judgment, plaintiff Clifton Wade filed an affidavit. Therein, he states
(1) a representative of defendant came to his home at about 10 P.M. on an unspecified date and "argued with my wife and myself on my front porch regarding payments to defendant."
(2) representatives of defendant called my home "numerous" (unspecified) times by phone and talked "sarcastically" to my wife and children regarding payment in connection with the 1975 automobile and at least two other Ford automobiles which had previously been financed by defendant commencing in at least 1971.
*152 (3) representatives of defendant called my home (on an unspecified date) and talked to me "early in the morning regarding payment."
(4) representatives of defendant called me at work numerous times necessitating my being called away from my job "to talk on the phone about payments."
(5) a representative of defendant called me on the day of the repossession, after it occurred and asked me how I was getting home, and
(6) representatives of defendant told my children I would go to jail and I would be walking if payments weren't made.
Missouri has recognized the principle as set forth in 1 Restatement of Torts (2d) § 46 that a right of action exists "for damages for severe emotional distress, intentionally and recklessly caused by `extreme and outrageous conduct.'" Warrem v. Parrish, Mo.1969, 436 S.W.2d 670, 673. However, as Warrem points out, the conduct which will give rise to such liability must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See also Kuehner v. Denny Loan Corporation, Mo.App.1974, 518 S.W.2d 94, 96.
In our judgment, accepting as fact plaintiffs' sworn version of the conduct of defendant's representatives it does not meet the test of extreme and outrageous conduct "undertaken intentionally, recklessly and with malice." Kuehner, supra. The case of Watson v. Franklin Finance, Mo.App.1976, 540 S.W. 186, relied on by plaintiffs, does not aid them on the motion for summary judgment. What was there at issue was the sufficiency of the petition on a motion to dismiss. Applying the settled rule that a petition may not be dismissed for failure to state a claim unless it appears therefrom that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, the Court held that under the pleading "it must readily be acknowledged that there are myriad sets of facts which plaintiff could [theoretically] prove to entitle her to relief." Here, the only facts are those set forth in the depositions of plaintiffs, their answers to defendant's interrogatories and the affidavit of Clifton Wade. And it is the sufficiency of those facts we are here ruling.
We can discern no impropriety in the fact that defendant's representative would telephone Clifton Wade once each month after he defaulted in making the payment on the due date for that month to remind him of the default and warning him of defendant's right to repossess. By so doing, defendant was making clear to Clifton Wade that it was not intending to waive its contractual rights. And assuming that the words used were that plaintiff "would be walking," that is obviously another way of stating that the car would be repossessed, as plaintiffs well knew. That the calls were made to plaintiff Clifton Wade's place of employment is understandable in view of the fact that his home telephone number was unlisted and not (after it was changed) made known to defendant.
Most of the "facts" relied on by plaintiffs are stated in vague generalities and are lacking in specifics as to dates, words used and the like. Couching the "facts" in conclusory words of color derived from decided cases adds nothing to their actual content. And it appears that for the most part, the incidents set forth do not pertain to the collection efforts relating to the 1975 automobile, in the period involved in this case nor do they suffice to warrant a finding of purposeful and malicious harassment of the nature required in this type of case. The conduct relied on by plaintiffs is not, under any view thereof, "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."
Accordingly, the motion for summary judgment as to Count III should be and is hereby sustained.
NOTES
[1] Another provision of the contract gives the assignee (defendant) all the rights and privileges of the Seller.
[2] The Uniform Commercial Code (Section 400.9-503, V.A.M.S.) provides that "(u)nless otherwise agreed a secured party has on default the right to take possession of the collateral."
[3] Parenthetically, we note from the deposition of Clifton Wade that he is under the mistaken belief that a payment is not in default until after the expiration of 10 days from its due date.
[4] Subsequently, plaintiffs signed and refiled identical answers.