NEVADA NATIONAL BANK, Appellant,
v. BILLY HUFF, Respondent.

No. 9342

August 1, 1978                                    582 P.2d 364

*Guild, Hagen & Clark, Ltd.,* of Reno, for Appellant.

*James W. Hardesty,* of Reno, for Respondent.

508

## OPINION

*Per Curiam:*

This is an appeal from a judgment of $10,082.04, entered after a jury verdict awarding respondent Huff compensatory and punitive damages for Nevada National Bank's (NNB) wrongful repossession of his truck. NNB alleges four errors: 1) that the jury erred in concluding that the repossession was wrongful; 2) that there was insufficient evidence before the district court upon which to base an instruction to the jury on the issue of punitive damages; 3) that Huff was required specifically to plead waiver; and 4) that the district court erred in excluding certain testimony by Huff's former counsel. We affirm.

On January 22, 1973, Huff entered into a "lease" arrangement with NNB with respect to a 1973 GMC pick-up truck. Monthly payments were set at $122.14 for a period of 36 months. Huff was to insure the vehicle.

In the three years prior to this transaction, Huff had engaged in two other commercial contracts with NNB: one, the installment purchase of his mobile home, and two, another "lease" arrangement concerning another truck. Both transactions had proved Huff to be a less-than-ideal debtor: he had paid late on a regular basis, often running several months in arrears, and his insurance had been cancelled on at least three occasions. Upon receipt of each of the notifications of cancellation, NNB had contacted both Huff and the insurer to arrange for reinstatement. On two occasions, the Bank had exercised the option reserved to itself under the contract and purchased

insurance itself, adding the costs to Huff's monthly payments. Huff was apparently well-known in the collection department as one to be consistently behind in his payments.

Against this course-of-dealing background, Huff and NNB entered into the January 1973 pick-up lease arrangement. As with the two prior contracts, NNB was contractually entitled to declare the lease in default upon any late payment or upon any interruption in insurance coverage. Upon default, NNB was entitled to repossess the vehicle. However, as with the two prior contracts, the Bank took no such action, even though Huff incurred late charges every single month from the inception of the lease, twice ran two months behind schedule, once ran three months behind schedule, and had his insurance cancelled for a period of ten months.

Rather, NNB simply attempted to nurse the transaction along. Pursuant to official bank policy, monthly notices of delinquent payments were sent to Huff, and bank employees often telephoned or visited Huff at his home with requests for payment. After such a telephone call or visit, Huff would usually make payment as requested. In January 1975, when he had fallen three payments behind schedule, Huff responded to a visit at his home by making three monthly payments in a two-week period. Also pursuant to official NNB policy, bank employees responded to receipt of notification of cancellation of Huff's insurance on the truck with a written inquiry to the insurer to ascertain whether the policy had been reinstated. After receipt of such a notification of cancellation in July 1974, such an inquiry was made. However, even though no notice of reinstatement was received for a period of ten months, the Bank took no steps toward repossession of the vehicle.

In March 1975, collections agent Fitzgerald became aware that the truck had been uninsured for ten months. Checking further, he found that Huff was fifteen days late on his March payment. Although not authorized to do so by any officer of the Bank, Fitzgerald and another employee went to Huff's property and repossessed the truck. However they were quickly apprehended by Huff who forcibly removed Fitzgerald from the truck, threatening both men with bodily harm, and drove off with his vehicle. Payment of the delinquent March installment was made the following day and insurance on the vehicle was reinstated soon after. This incident apparently engendered some hostility toward Huff in the Collections Department of NNB.

Huff was late with his payments every month after March 1975. In June 1975, he fell two months behind, but made a double payment which brought him current through July 1. On

July 17, when he was technically one payment behind again, Huff made another double payment, bringing him current through September 1. Huff made this last payment in an attempt to get ahead of schedule so that he could take an extended vacation. He apparently thought, erroneously, that the July 17 double payment would bring him current through October 1, 1975.

On October 15, 1975, Huff's insurer notified him that the insurance on the truck was about to be cancelled. On this same date, the insurer mailed official notification of the impending cancellation to NNB as "owner" of the vehicle. This notice stated that coverage would expire ten days after receipt of the notice by the "owner." This notice was received by NNB on October 21, thus informing them that the insurance would expire on October 31, ten days later.

On October 16, Huff personally visited the insurer's Reno office, where he paid his past-due premium and averted the impending cancellation of his insurance coverage. After payment, he requested the insurance agent to telephone NNB informing them of the reinstatement. It is not clear whether this call was actually made, however a written notice of reinstatement was mailed to NNB from the insurer's San Francisco office on November 3.

On October 21, five days after Huff had forestalled cancellation of the insurance policy, NNB Assistant Branch Manager Sharp received the cancellation notice sent on October 15 by the insurer, informing NNB that coverage would lapse on October 31. Disregarding both the official bank policies described above and the Bank's entire course of dealing with Huff, Sharp 1) did not telephone or otherwise contact either Huff or the insurer to ascertain whether the past-due premiums had been paid and cancellation averted (it had); 2) did not telephone or otherwise contact Huff regarding his arrearages on his monthly payments, and 3) did not inform Huff that strict compliance with the terms of the lease agreement would henceforth be required to avert repossession. Rather, Sharp and another NNB employee went on Huff's property at 1 a.m. on Saturday, October 25, and repossessed the truck.

Because of the cold weather during the night-time hours, Huff had equipped the truck with an electric heater, connected to his near-by house trailer by an electrical cord, in order to keep the water pipes in the truck and its camper from freezing. As Sharp and his companion drove away, this electical cord snapped, disconnecting the heater. The truck was then driven to the Washoe County Sheriff's Department where, leaving the truck parked on a downtown street, both men entered the

building to report the repossession. Although both knew the camper on the back of the truck to be unlocked, neither remained to guard it. They then drove the truck to a storage yard where again no precautions were taken to secure the camper. Further, no inventory was taken of the camper. When Huff was allowed to inspect the truck some five days later, four hunting rifles valued at $900, a walkie-talkie radio, and a fishing tackle box were missing from the camper. When Huff finally regained possession of the truck, it was discovered that all water pipes in the camper and truck had frozen and burst. Further, the back door of the camper unit had been "jimmied" open, and the rear end of the truck had been damaged in a minor collision.

1. *Did the Jury Err in Finding that the Repossession was Wrongful?*

In discussing the propriety of NNB's conduct in this case, both parties have centered their arguments exclusively around a collection of cases dealing with installment purchases under Article 9 of the Uniform Commercial Code (NRS 104.9101–9507). If it were in fact necessary in this case to positively characterize the commercial agreement between Huff and NNB as either a traditional lease or a security interest, it seems clear that its characteristics as the latter would far outnumber any it possessed as the former.[1] *See,* Whitworth v. Krueger, 558

---

[1]Under the terms of the "lease" between NNB and Huff, Huff was to make monthly payments of $122 for a period of 36 months. Of this monthly payment, $35 was labeled a "finance charge", and $85 "depreciation reserve". This latter figure was subtracted monthly from the "capitalized cost" of the truck, or the price for which the Bank had originally purchased the vehicle from the dealer. At the end of the 36-month term, Huff could either "purchase" the truck for the difference between his total payments of "depreciation reserve" and the "capitalized cost", or he could return the truck to NNB for NNB to sell on the open market. However in this latter case, Huff was liable to NNB for any shortfall in the proceeds of the sale from the unpaid balance of the "capitalized cost". In other words, upon signing the "lease agreement", Huff became instantly liable for the entire cost of the truck.

This same liability attached if for any reason, including the total destruction of the vehicle as Huff drove out of the lot on the first day of the "lease", the lease arrangement were to end: upon such an occurrence, NNB would "sell" the car (including a sale for nothing if the truck had been destroyed) and Huff would be liable for the difference between his "depreciation reserve" payments to date and the original value of the vehicle.

In Whitworth v. Krueger, 558 P.2d 1026, 1029, the Supreme Court of Idaho stated: "[T]he fact that the Kruegers' agreement was entitled a 'lease' rather than an 'installment sale contract' does not mean that the Kruegers were not subject to these provisions of the UCC. In circumstances where the 'lease' gives the 'lessee' the option to acquire the 'leased' goods at the expiration of the 'lease' term without additional consideration or for nominal consideration, i.e., where the 'lease' is commercially indistinguishable from an installment sales contract, [UCC § 1-201(37)] provides that a 'lessor's' interest in 'leased' goods is a security interest. . . ."

P.2d 1026 (Idaho 1976); Kupka v. Morey, 541 P.2d 740 (Alaska 1975); Puritan Leasing Company v. August, 546 P.2d 679 (Cal. 1976); Meyer v. World Concrete, Inc., 431 P.2d 403 (Okla. 1967); *cf.* Fuqua v. Hanson, 567 P.2d 862 (Kan. 1977). *See gen.,* Coogan, "Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1-201(37) and Article 9," 1973 Duke L.J. 909. However we need not definitively characterize the commercial agreement in this case, since we conclude that UCC-based statute and case law should govern this commercial arrangement by analogy, to the extent it is not so governed outright. In the recent case of Hiles Co. v. Johnston Pump Co., 93 Nev. 73, 560 P.2d 154 (1977), we held that under appropriate circumstances, the provisions of the Uniform Commercial Code (NRS Chapter 104) would extend by analogy to lease transactions not technically within the Code's scope. When, as here, a lease arrangement "serve[s] a commercial function closely analogous to such other common financing methods as conditional sales and chattel mortgages," Puritan Leasing Company v. August, *supra,* 546 P.2d at 686, we think the various parties involved should become subject to both the duties imposed and the protections accorded under the Uniform Commercial Code and its interpretive case law. *See also,* All-States Leasing Company v. Bass, 538 P.2d 1177 (Idaho 1975); Baker v. City of Seattle, 484 P.2d 405 (Wash. 1971).

Clearly there is nothing unconscionable in a contract clause authorizing the repossession of a chattel upon default. *See,* Lawrence Barker, Inc. v. Briggs, 248 P.2d 897 (Cal. 1952). Indeed, Article 9-503 of the UCC specifically authorizes such self-help remedies upon the condition that they be carried out without breach of the peace. NRS 104.9503. Further, an established course of dealing under which the debtor (lessee) makes continual late payments and the secured party (lessor) accepts them does not result in a waiver of the secured party's right to

Under this definition, the "lease" in ths case would appear to be a security interest: upon his initial entry into the "lease agreement", Huff became instantaneously liable for the entire value of the truck, either as a direct debtor in the event that he himself chose to "buy" the truck at the end of the 36-month term, or else as guarantor of the total original purchase price in the event that the vehicle was destroyed or sold to someone else. Upon complying with the terms of the lease, therefore, the truck became his at the end of the lease term for nothing more than that for which he was already contractually liable, i.e., *for no additional consideration.* Upon analysis, this "lease agreement" appears to be nothing other than an installment sales contract arranged for optimum federal tax results: the monthly "rental" payments exactly equal the total allowable deductions for interest ("finance charge") and depreciation ("depreciation reserve"), with the traditional "down payment" reserved for the end of the transaction.

rely upon a clause in the agreement authorizing him to declare a default and repossess the chattel. Ford Motor Credit Company v. Waters, 273 So.2d 96 (Fla.App. 1973); Fontaine v. Industrial National Bank of Rhode Island, 298 A.2d 521, 11 U.C.C.Rptr. 1096 (R.I. 1973).

However, it is clear that even though no outright waiver of a secured party's right to rely upon such a clause occurs through a course of dealing involving the acceptance of late payments, a secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must,* before he may validly rely upon such a clause to declare a default and effect repossession, *give notice* to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided. Ford Motor Credit Company v. Waters, *supra;* Fontaine v. Industrial Bank of Rhode Island, *supra;* Kupka v. Morey, *supra;* Varela v. Wells Fargo Bank, 93 Cal.Rptr. 428 (Cal.App. 1971).

Assessing NNB's conduct in this case, it must be noted at the outset that Huff effectively forestalled any lapse in the insurance coverage on the truck, thus precluding any declaration of default for this reason. Thus, the only ground upon which the Bank could have declared a default under the contract was Huff's one and one-half month arrearage in his payments: on October 21, Huff had paid only through September 1, instead of through November 1 as required under the contract. This delinquency clearly would constitute valid grounds for the declaration of a default under the contract.[2]

However, analysis of the course of dealing between Huff and NNB, both with respect to the specific transaction in question and with respect to the two similar transactions during the same time period, reveals that it was a common occurrence for Huff to be behind in his monthly payments. In fact, Huff had been late with every single payment under the truck lease. Further, he had been two payments behind on two occasions, and three payments behind on one occasion. In spite of these delinquencies, NNB had never declared a default or invoked its right to repossess. (The March 1975 repossession attempt was based primarily upon Huff's failure to insure the vehicle: at that time

---

[2]Under § 13 of the lease agreement, "[i]f Lessee shall default in the payment of any installment of fixed rents, or any other sums payable hereunder by Lessee, . . . then in such event Lessor, at its sole option, may declare this lease in default. Upon Lessor declaring this lease in default, . . . Lessor or its agents may take possession of said vehicle wherever same may be found and may enter upon any premises of Lessee to take possession of same."

he was only 15 days delinquent on his March payment.) Rather, written and oral demands for payment had always been made upon him, and payment had always quickly followed.

This course of conduct established between Huff and NNB imposed upon NNB the duty, before it could properly rely upon the default and repossession clauses in the lease agreement, to give notice to Huff that strict compliance with the terms of the long-ignored contract would henceforth be required in order to avert repossession of the vehicle. Upon NNB's failure to give such notice, the jury could properly have concluded that NNB's repossession of the truck was wrongful.

2. *Was the Jury Properly Instructed on Punitive Damages?*

NNB next argues that even if the repossession was improper, the record is devoid of evidence upon which the district court could have based its instruction to the jury on punitive damages under NRS 42.010. This section reads, in pertinent part:

> "*Cases in which exemplary, punitive damages may be awarded.* In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

In Caple v. Raynel Campers, Inc., 90 Nev. 341, 526 P.2d 334 (1974), we stated that "[t]he malice contemplated by NRS 42.010 is malice in fact . . . [which] must be established by the evidence if it is the ground relied upon to support an award of punitive damages. Malice in fact sufficient to support an award of damages may be established by a showing that the wrongful conduct was willful, intentional and done in reckless disregard of its possible results." 90 Nev. at 344.

In *Caple* we approved the award of punitive damages in a wrongful repossession case in which the buyer was not in default or even alleged to be so by the creditor. In that case, the repossessor acknowledged that its actions had been completely in error; nonetheless the vehicle had never been returned to the debtor. In Nevada Credit Rating Bur. v. Williams, 88 Nev. 601, 503 P.2d 9 (1972), we approved an award of punitive damages following a grossly excessive attachment of goods to satisfy an unrelated debt. In Ford Motor Credit Company v. Waters, *supra,* a wrongful repossession involving a creditor's disregard without notice of a pre-established course of conduct in accepting late payments was held to support the award of punitive damages, when the repossessor's agent failed to take proper precautions to insure the safety of personal property

found in the repossessed vehicle, and had disregarded established company policies with respect to such property.

Analysis of the Bank's conduct in this case reveals that there was ample evidence presented at trial of malice in fact, upon which the district court could validly have based its instruction on punitive damages. The repossession was based in large part upon the notice of impending cancellation of insurance coverage received by Sharp on October 21. However, Sharp admitted at the trial that, in complete violation of established bank policy, he took no steps to ascertain whether the cancellation had been averted, which it in fact had been five days before he received the notice. Sharp's repossession of the vehicle in these circumstances could properly have been characterized by the jury to be "wrongful conduct [that] was willful, intentional and done in reckless disregard of its possible results." Caple v. Raynel Campers, Inc., *supra,* 90 Nev. at 344. As in Ford Motor Credit Company v. Waters, *supra,* no care was taken to protect the personal property found in the vehicle after repossession: the electrical cord connecting the heater to an electrical socket in Huff's mobile home was ripped out; the camper was left unlocked in downtown Reno at 2 a.m. on a Saturday; the camper was left unlocked at the tow yard; no precautions were taken to insure that the vehicle was protected against freezing.[3] Finally, the Bank's failure to protect Huff's personal property and the property of others in the camper at the time of the repossession resulted in the theft of valuable property and substantial freezing damage to the truck and camper. Upon these facts, we find that the trial court had sufficient evidence before it upon which to base an instruction to the jury under NRS 42.010.

3. *Was Huff Required Specifically to Plead Waiver?*

NNB cites the general rule that waiver or estoppel must be specifically pleaded. However, as stated by the court in Ford Motor Credit Company v. Waters, *supra,* 273 So.2d at 100, in an identical context, "waiver is not the issue before us. The issue is the right of the buyer to rely upon the prior dealings that had taken place and the buyer's right to be notified of a modification of such conduct on the part of the [creditor]." *See also,* Varela v. Wells Fargo Bank, *supra,* 93 Cal.Rptr. at 431.

4. *The Testimony of Huff's Former Counsel.*

---

[3]The "Repossession Report" filled out by Sharp and his fellow NNB employee contains a blank to be checked by the repossessors reading: "Antifreeze checked?" This question was answered with a check in the box labeled "no."

516

Early on in the course of the trial, Huff called Attorney Albright as a plaintiff's witness, in order to have Albright verify the damage that had been done to the door of the camper and the rear end of the truck. Albright had represented Huff at the time of the repossession and the initial inspection of the vehicle, but had ceased to do so by the time of the trial. NNB then sought on cross-examination to question Albright as to the reasons for the termination of his attorney-client relationship with Huff. Upon objection, the Bank made an offer of proof to the effect that the proposed testimony would show that Albright withdrew from the case because of his difficulty in getting in touch with Huff. This, according to the Bank, was relevant to "a course of conduct by Mr. Huff that he simply does not communicate with people he doesn't want to communicate with."

The trial court, relying on NRS 48.035,[4] found that the marginal relevance of this evidence was substantially outweighed by the danger that the testimony of Huff's former attorney as to the facts concerning the breakdown of the relationship could cause "confusion . . . and potential prejudice," and could inject collateral issues which would divert the jury from the real issues in the case. In light of the extremely marginal relevance of this evidence, this conclusion was correct.

Affirmed.

---

[4]NRS 48.035(1): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."