Ted MOE, Plaintiff and Appellant,

v.

JOHN DEERE COMPANY, Defendant and Appellee,

and

Day County Implement Company, Defendant.

No. 18308.

Supreme Court of South Dakota.

Considered on Briefs Dec. 2, 1993.

Decided May 25, 1994.

Bret Chancelor Merkle, Samp Law Offices, Sioux Falls, for plaintiff and appellant.

James M. Wiederrich, Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellee.

MOSES, Circuit Judge.

This is an appeal by Ted Moe (Moe) from a summary judgment granted by Third Judicial Circuit Court in favor of John Deere Company (Deere) and Day County Implement Company (Implement). We reverse.

## FACTS

On September 29, 1983, Moe bought a farm tractor from Day County Equipment in Watertown, South Dakota. He purchased a John Deere D8850 for a cash price of $121,-268.00. In financing the transaction, Moe traded in two old tractors for the amount of $77,543.00 and agreed to pay the $59,802.40 difference in five equal installments of $11,-960.48 each due on October 1st for the years 1984, 1985, 1986, 1987 and 1988. After the contract was completed it was assigned to Deere on September 30, 1983.

Moe was two months late in paying his first installment. Rather than paying $11,-960.48 on October 1, 1984, Moe paid $12,-212.87 on December 3, 1984. On October 1, 1985, Moe was again unable to timely pay his second installment. Deere waived full payment and extended the time in which Moe was to make this payment. On January 13, 1986, Moe made a partial payment in the amount of $6,200.00, over three months late. Moe and Deere agreed that Moe was to pay a second amount on March 1, 1986 in the amount of $6,350.17 to complete the second installment. On March 10, 1986, Deere sent a notice to Moe indicating that Moe's second installment was past due and that he had

until March 20, 1986 to pay $6,389.48 to bring his account current. Again Moe missed this payment deadline.

Deere did not follow up on the delinquent payment until a representative from Deere contacted Moe sometime in May or the first part of June 1986, over seven months after the second installment was originally due. Deere's representative and Moe agreed that Moe would pay $2,000.00 of the $6,389.48 plus interest owing to Deere and Deere would allow Moe to pay the balance when he started to harvest. Deere's representative and Moe failed to specify the due date for either the $2,000.00 payment or when the balance was due. Moe had no further conversations with the representative from Deere about the $2,000.00 until after Deere repossessed the tractor on July 30, 1986.

Moe, who was in Oklahoma at the time of repossession, did not receive any notice from Deere's representative that the tractor was going to be repossessed because his payments were delinquent. Deere reassigned Moe's contract to Implement following the repossession. On August 1, 1986, Deere mailed from Minneapolis, Minnesota a certified letter dated July 31, 1986 to Moe which indicated that Deere "[found] it necessary to gain possession of the equipment involved." This letter apparently was returned to Deere undelivered to Moe. Thus, Deere hand-addressed a new letter and sent it to Moe who picked it up on August 18, 1986. The letter indicated:

> We intend to reassign your contract to the above named dealer. Once we reassign it, two weeks from the date of this letter, you will contact them on all matters concerning the disposition of the equipment or the amount owed under the contract. They intend to dispose of said collateral by public or private sale. If you wish to redeem this equipment, you must pay to John Deere Company $37,591.20 plus any expenses incurred from this repossession, in cash certified funds, before we reassign the contract.

> We hope you will be able to pay this amount within the prescribed period. If you have any questions regarding this mat-

ter please contact us. M.K. Mehus, Manager Financial Services.

Implement sold the tractor on August 19, 1986 for $44,000.00. Implement paid Deere in full on the contract and applied the proceeds to the debt and turned over the excess proceeds to Moe's lender by mailing two (2) checks totalling $2,616.77 to the Farmers and Merchants Bank on December 1, 1986.

Moe sued Deere and Implement on the following causes of action: (1) wrongful repossession; (2) fraudulent repossession; (3) commercially unreasonable sale; and (4) failure to account for the surplus.

Deere moved for partial summary judgment on the third and fourth issues of commercially unreasonable sale and failure to account for surplus. The trial court granted Deere's motion. Then, Deere moved for summary judgment on the first and second issues of wrongful repossession and fraudulent repossession. On February 5, 1993, the trial court issued an order granting Deere's summary judgment motion on both issues. Moe appeals.

## STANDARD OF REVIEW

In reviewing a grant of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party has demonstrated that there is no genuine issue of material fact and he is entitled to judgment as a matter of law. *Breen v. Dakota Gear & Joint Co.,* 433 N.W.2d 221, 223 (S.D. 1988); *Groseth Intern. Inc. v. Tenneco, Inc.,* 410 N.W.2d 159, 164 (S.D.1987); *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). The evidence must be viewed most favorably to the nonmoving party and reasonable doubt should be resolved against the moving party. *Groseth,* 410 N.W.2d at 164 (citing *Trapp v. Madera Pacific, Inc.,* 390 N.W.2d 558 (S.D.1986); *Wilson,* 157 N.W.2d at 21). Summary judgment is an extreme remedy which should be awarded only when truth is clear and all reasonable doubts touching the existence of a material fact should be resolved against the movant. *Tucek v. Mueller,* 511 N.W.2d 832 (S.D.1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The rules of procedure favor the resolution of cases upon the merits by trial or summary judgment rather than on failed or unartful accusations. 5 C. Wright & Miller, Federal Practice and Procedure, § 1357 (1971); *Janklow v. Viking Press,* 378 N.W.2d 875, 877 (S.D.1985).

## ISSUE

DO GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER MOE WAS IN "DEFAULT" PRECLUDE THE GRANTING OF SUMMARY JUDGMENT?

We recognized in *First Nat. Bank of Black Hills v. Beug,* 400 N.W.2d 893, 896 (S.D. 1987), that "[t]he term 'default' is not defined in the Uniform Commercial Code, thus we must look to other sources for a definition." *Id.* at 895. Then, we turned to hornbook law for a definition of default:

> 'Default' triggers the secured creditor's rights under Part Five of Article Nine. But what is 'default?' Article Nine does not define the word; instead it leaves this to the parties and to any scraps of common law lying around. Apart from the modest limitations imposed by the unconscionability doctrine and the requirement of good faith, default is 'whatever the security agreement says it is.'

*Id.* at 896 (quoting J. White & R. Summers, Uniform Commercial Code § 26–22 at 1085–86 (2d ed. 1980)).

■ Several jurisdictions recognize that the determination of default is not a matter of law for the court to decide. Whether a breach or a default exists is a question of fact. *Palmiero v. Spada Distributing Company,* 217 F.2d 561 (9th Cir.1954). "[I]t is equally well-settled that whether the parties' conduct constitutes a breach 'presents a pure question of fact that the trier of fact alone may decide.'" *Concise Oil & Gas v. La. Interstate Gas Corp.,* 986 F.2d 1463, 1496 (5th Cir.1993) (quoting *Turrill v. Life Ins. Co. of North America,* 753 F.2d 1322, 1326 (5th Cir.1985)); *Town of Breckenridge v. Golforce, Inc.,* 851 P.2d 214 (Colo.Ct.App.

1993). In *Breckenridge,* the Colorado Court of Appeals stated, "Whether there has been a breach of a contract is an issue for the fact finder." *Breckenridge,* 851 P.2d at 216. In *Bator v. Mines Development, Inc.,* 513 P.2d 220 (Colo.Ct.App.1973), the court stated that a "[d]etermination of whether a party has performed under a contract is ultimately a question of fact." *Id.* at 225 (citation omitted).

■ Here, the promissory note provided a definition of default:

> The borrower shall be in default upon the occurrence of any one or more of the following events: (1) the Borrower shall fail to pay, when due, any amount required hereunder, or any other indebtedness of the borrower to the Lender of any third parties; (2) the Borrower shall be in default in the performance of any covenant or obligation under the line of credit or equivalent agreement for future advances (if applicable) or any document or agreement related thereto; (3) any warranty or representation made by the Borrower shall prove false or misleading in any respect; (4) the Borrower or any Guarantor of this promissory note shall liquidate, merge dissolve, terminate its existence, suspend business operations, die (if individual), have a receiver appointed for all or any part of its property, make an assignment for the benefit of creditors, or file or have filed against it any petition under any existing or future bankruptcy or insolvency law; (5) any change that occurs in the condition or affairs (financial or otherwise) of the Borrower or any Guarantor of this promissory note which, in the opinion of the lender, impairs, the Lender's security or increases its risk with respect to this promissory note or (6) an event of default shall occur under any agreements intended to secure the repayment of this promissory note. Unless prohibited by law, the Lender may, at its option, declare the entire unpaid balance of principal and interest immediately due and payable without notice or demand at any time after default as such term is defined in this paragraph.

Technically, there was a breach of the security agreement and the promissory note when

Moe did not make his payment on October 1, 1984, but instead paid it on December 3, 1984. One could find Moe in default, and under SDCL 57A–9–503, Deere would have had a right to repossess the tractor. However, Deere's right to a default or remedies under breach of contract can be modified or waived by the conduct of the parties.

The trial court's memorandum opinion indicated that "The terms of the written contract should control. Further the 'course of dealing' between the parties is not persuasive." However, here there is a question of fact. Did the oral statements and conduct of the parties modify the written agreement? In *Alaska Statebank v. Fairco Fin.*, 674 P.2d 288 (Alaska 1983), the issue was if the parties' oral statements and conduct between September 15, 1978 and November 6, 1978 modified the written agreement so that pre-possession notice was required. The court held:

> [M]odification of a written contract may be effected either through subsequent conduct or oral agreements. Whether a modification has occurred is a question of fact. The superior court found that the parties had agreed to such modification, "[g]iven the course of dealings between the parties. . . ."

*Id.* at 292 (quoting *Nat. Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 586–87 (Alaska 1976)). *See* SDCL 53–8–7 (1990); *See also* South Dakota Pattern Jury Instruction No. 47–16 for Modification of a Written Contract by Subsequent Oral Agreement.

The record reveals through affidavits and depositions that the oral statements and conduct of the parties herein between October 1, 1984 and July 30, 1986 appear to modify the written agreement. Deere sent notice to Moe that he had until March 20, 1986 to pay $6,389.48 including late charges. Moe admits that in May or the first week of June 1986 he agreed to pay the March installment in two parts. He agreed to pay $2,000.00 with the balance due in August 1986 when he commenced his wheat harvest. There was no date certain by which Moe was to pay the $2,000.00. In determining if there was a default on the part of Moe in complying with this contract, all statements and conduct of the parties are essential in determining whether there was an oral modification or waiver of the promissory note or security agreement by John Deere.

## WHETHER A NON–WAIVER CLAUSE IN THIS CONTRACT IS ENFORCEABLE?

The second issue that needs to be addressed is whether the "non-waiver clause" is enforceable in this contract. Deere's brief refers to this clause as an "anti-waiver" clause but we will refer to it as a "non-waiver" clause. *See Lewis v. National City Bank*, 814 F.Supp. 696, 699 (N.D.Ill.1993) (referring to the clause dealing with waiver provisions as a "non-waiver" clause). The security agreement between Moe and Deere contained the following provisions:

> In the event of default (as defined on the reverse side hereof), holder may take possession of the Goods and exercise any other remedies provided by law.

> This contract shall be in default if I (we) shall fail to pay any installment when due. . . .

> In any such event (default) the holder may immediately and without notice declare the entire balance of this contract due and payable together with reasonable expenses incurred in realizing on the security interest granted hereunder, including reasonable attorney's fees.

> Waiver or condonation of any breach or default shall not constitute a waiver of any other or subsequent breach or default.

We now turn to other jurisdictions' interpretations of the "non-waiver" clause.

Courts have adopted two basic rules for interpreting situations where repeated late payments have been accepted by a creditor who has the contractual (*i.e.*, "non-waiver" clauses) and the statutory right (*i.e.*, SDCL 57A–9–503) to repossess the collateral without notice. Some courts have held that the acceptance of late payments does not waive or otherwise affect the right of a creditor to repossess without notice after subsequent late payment defaults. *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869 (10th Cir.

1981); *Tillquist v. Ford Motor Credit Co.*, 714 F.Supp. 607 (D.Conn.1989); *Wade v. Ford Motor Credit Co.*, 455 F.Supp. 147 (E.D.Mo.1978); *Hale v. Ford Motor Credit Co.*, 374 So.2d 849 (Ala.1979); *Van Bibber v. Norris*, 419 N.E.2d 115 (Ind.1981). Other courts have imposed a duty on the creditor to notify the debtor that strict compliance with the time for payment will be required in the future or else the contract remedies may be invoked. *See, e.g., Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232 (Minn.1980); *Ford Motor Credit Co. v. Washington*, 573 S.W.2d 616 (Tex.Civ.App.1978); *Lee v. Wood Products Credit Union*, 275 Or. 445, 551 P.2d 446 (1976); *Nevada Nat. Bank v. Huff*, 94 Nev. 506, 582 P.2d 364, 369 (1978); *Pierce v. Leasing Intern., Inc.*, 142 Ga.App. 371, 235 S.E.2d 752 (1977); *Ford Motor Credit Company v. Waters*, 273 So.2d 96 (Fla.App.1973); *See also* 2 J. White & R. Summers, Uniform Commercial Code, § 27–2 at 563–65 (3d ed. 1988).

Deere urges us to adopt the position that the acceptance of late payments does not waive or otherwise affect the right of a creditor to repossess without notice after subsequent late payment defaults stating to do so would mean that the "non-waiver" clause is a nullity.

A majority of states who have considered the issue adhere to the general rule that "a secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must*, before he may validly rely upon such a clause to declare a default and effect repossession, *give notice* to the debtor ... that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided." *Huff*, 582 P.2d at 369 (citations omitted) (emphasis in original).

The basis for imposing this duty on the secured party is that the secured party is estopped from asserting his contract rights because his conduct has induced the debtor's justified reliance in believing that late payments were acceptable. SDCL 57A–1–103 preserves the law of estoppel. The acts which induced reliance are the repeated acceptance of late payments. The reliance is evidenced by the continual pattern of irregular and late payments.

■ The debtor has the right to rely on the continuation of the course of performance and that right to rely is sufficient to satisfy the reliance element. *See Waters, supra.* This right to rely is supported by the policy of the Uniform Commercial Code which encourages the continual development of "commercial practices through, custody, usage, and agreement between the parties." *See* U.C.C. § 1–102(2) or SDCL 57A–1–102(2). South Dakota's adaptation of the Uniform Commercial Code is found in Title 57A of the South Dakota Code. The purpose of Title 57A is found in SDCL 57A–1–102 and states in pertinent part as follows:

1) This title shall be liberally construed and applied to promote its underlying purposes and polices.

(2) Underlying purposes and polices of this title are

(a) To simplify, clarify and modernize the law governing commercial transactions;

(b) To permit the continued expansion of commercial practices, through custom, usage and agreement of the parties;

SDCL 57A–1–102(1)–(2) (1988). The Uniform Commercial Code should be liberally construed and applied to promote its underlying purposes and policies. *First Nat. Bank v. John Deere Co.*, 409 N.W.2d 664 (S.D. 1987).

Adopting the rule that a creditor must give pre-possession notice upon modification of a contract results in both the debtor and the creditor being protected. The debtor would be protected from surprise and from a damaging repossession by being forewarned that late payments would no longer be acceptable. Likewise, the creditor would be protected utilizing the device of "one letter." The creditor can totally preserve his remedies so that if the account continues in default, repossession could be pursued as provided in the contract without further demand or notice. It is recognized that this rule does place the creditor in a slightly worse position because if a creditor sends out a letter to preserve his rights and then once again ac-

cepts late payments another notice would be required. The second notice would be required because the acceptance of the late payment after the initial letter could again act as a waiver of the rights asserted in the letter.

■ We hold that the repeated acceptance of late payments by a creditor who has the contractual right to repossess the property imposes a duty on the creditor to notify the debtor that strict compliance with the contract terms will be required before the creditor can lawfully repossess the collateral.

The dispositive issue is if the plaintiff was in default. Whether a default exists is a factual question not properly resolved on a motion for summary judgment. Defendant's right to repossess turns on this default. Therefore what constitutes a "breach of the peace" when repossessing collateral is premature at this time. We reverse this order and the judgment of the circuit court and remand for trial.

MILLER, C.J., and HENDERSON and SABERS, JJ., concur.

WUEST, J., concurs in result and concurs specially.

MOSES, Circuit Judge, for AMUNDSON, J., disqualified.

WUEST, Justice (concurring in result, concurring specially).

I concur in result, and write specially to point out that we do have law in South Dakota regarding whether the existence of breach of contract is a question of fact. *See Yankton Prod. Credit Ass'n v. Jensen,* 416 N.W.2d 860, 864 (S.D.1987) (determining that the question of whether there was a breach of contract is a question of fact); *Swiden Appliance & Furniture v. National Bank of S.D.,* 357 N.W.2d 271, 277 (S.D.1984) (stating that the question of breach of contract is a legal conclusion resting "upon substantial issues of material fact that are rightfully jury questions.").