**Stuart R. VANDERHURST, Plaintiff,**

v.

**COLORADO MOUNTAIN COLLEGE DISTRICT, a Colorado junior college district, and Colorado Mountain College Board of Trustees, a Colorado junior college board of trustees, Defendants.**

Civil No. 97–B–563.

United States District Court, D. Colorado.

Aug. 18, 1998.

Bradley C. Bartels, Martha R. Houser, Gregory J. Lawler, Sharyn E. Dreyer, Colorado Education Association, Denver, CO, for Plaintiff.

Daniel R. Satriana, Jr., Hall & Evans, L.L.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this employment termination dispute, defendants Colorado Mountain College District (CMC District) and Colorado Mountain College Board of Trustees (CMC Board)(collectively, CMC or defendants) move to dismiss claim seven and seek summary judgment on claims one, two, three, four, seven and eight brought by plaintiff Stuart R. Vanderhurst (Vanderhurst). Also pending is defendants' motion to strike certain allegations of Vanderhurst's Second Amended Complaint. Vanderhurst filed a cross-motion for summary judgment on claims three and four.

I will deny the motion to dismiss and the motion to strike. I will grant defendants' summary judgment motion in part and deny it in part and will deny Vanderhurst's cross-motion.

## I.

The following facts are undisputed. Vanderhurst was employed by CMC as Professor and Clinician in Veterinary Technology (Vet Tech) for over 22 years pursuant to a series of annually renewable employment contracts. Pltf. Ex. 1–2. The Vet Tech program is a two-year program designed to train students to be veterinary assistants. Vanderhurst's 1995–1996 employment contract provides, in pertinent part, that "[t]he Employee is bound by the policies, rules and regulations set forth in the Colorado Mountain Junior College District Policy Manual... applicable to faculty members.... The Employee is also bound by the ... administrative rules, regulations, and policies of the College...." Pltf. Ex. 1.

On December 14, 1995, CMC notified Vanderhurst that it was considering terminating his employment based upon the following allegations of misconduct:

A. *Student allegations:*

1. In or about October 1995, during a freshman class, Vanderhurst made reference to a "tampon" in the sewage plant, describing it as appearing to be a mouse or a rat;

2. In the same lecture period, Vanderhurst made a reference to oral and anal sex;

3. On another occasion, Vanderhurst stated "I will not make any blonde jokes" in response to a question posed by a female student and in the past has made other comments about blondes;

4. At various times, Vanderhurst used in class the terms "big chair," "big dog," and "floaters and sinkers" when discussing human feces;

5. On one occasion, Vanderhurst referred to a student as "Rosebud" and then attempted to cover up the comment by a similar reference to all other students;

6. Vanderhurst discussed in class, without the student's permission, a situation involving a student being bitten by a pig;

7. Vanderhurst used or referred to comments made by students on test evaluations in an inappropriate manner;

8. Vanderhurst requested students not to make comments regarding his classroom comments and behavior on their evaluations;

9. Vanderhurst made statements or comments about how "dumb" his students were;

10. Vanderhurst directed negative comments to students about staff member Laura Van Dyne (Van Dyne);

11. Vanderhurst used class time to discuss matters not relevant to course content;

12. Vanderhurst allowed sophomore students to address his freshman class during class time about matters that upset some students.

Pltf. Exs. 13–14. Also, there was an allegation that Vanderhurst withheld class lecture materials from Van Dyne.

The CMC administration investigated each complaint and determined that Vanderhurst had violated CMC's sexual harassment policy and Code of Ethics. After considering the severity of the violations and Vanderhurst's history of warnings and disciplinary action based on similar behavior, CMC determined that it would recommend Vanderhurst's dismissal.

B. *Prior warnings and disciplinary actions*

According to CMC, it relied on the following prior incidents in reaching its decision to recommend Vanderhurst's dismissal:

1. In 1989, Vanderhurst's supervisor, Assistant Dean of Instruction Thomas McBrayer (McBrayer) warned Vanderhurst about complaints received from students about his use of profanity and offensive language during classes. Apparently, Vanderhurst assured McBrayer that the behavior would stop. Pltf. Exs. 6; 7, p. 153; and

2. In 1991, Vanderhurst was suspended for part of the academic year because of acts of sexual harassment. Vanderhurst grieved the suspension through the CMC

grievance policy. The suspension was upheld by CMC and, ultimately, the United States District Court for the District of Colorado in case number 91–S–2091.

On December 22, 1995, CMC notified Vanderhurst that he was suspended without pay pending further proceedings and that CMC intended to proceed with the dismissal recommendation. Pltf. Ex. 15. Vanderhurst grieved the dismissal recommendation pursuant to the CMC Board policy. Pltf. Ex. 13. His grievance proceeded through all levels of review, culminating in the CMC Board's October 23, 1996 finding that Vanderhurst's dismissal was justified. Pltf. 13, p. 6. On February 27, 1997, Vanderhurst filed an action in the Garfield County District Court, Colorado which was removed on March 20, 1997.

## II.

### Claims

| CLAIM NO. | CLAIM |
|---|---|
| One | Breach of Contract–Board of Trustees Policies |
| | Def: CMC and CMC Board |
| Two | Deprivation of Constitutional Rights–State Law and 42 USC § 1983—Speech |
| | Def: Same |
| Three | Deprivation of Constitutional Rights–State Law and 42 USC § 1983—Due Process –Sexual Harassment Charges |
| | Def: Same |
| Four | Deprivation of Constitutional Rights–State Law and 42 USC § 1983—Due Process –Ethics Charges |
| | Def: Same |
| Five | Intentional Interference with Contract—Inducing Breach of Contract |
| | Claim dismissed by stipulation |
| Six | Civil Conspiracy |
| | Claim dismissed by stipulation |
| Seven | Deprivation of Constitutional Rights–State Law and 42 USC § 1983—Equal Protection |
| | Def: Same |
| Eight | Copyright Infringement—17 USC § 101, *et seq.* |
| | Def: Same |

## III.

### Defendants' motions to dismiss and strike certain allegations

#### A. *Motion to dismiss*

In July 1997, CMC filed a motion to dismiss claims five, six, and seven. On March 13, 1998, pursuant to a stipulated motion to dismiss, I entered an Order dismissing, with prejudice, claims five and six and the individual defendants named in the complaint. Order, March 13, 1998. Hence, I will deny as moot the motion to dismiss as to claims five and six.

1. *Claim seven for deprivation of the constitutional right to equal protection under state law and 42 U.S.C. § 1983*

■ Defendants move to dismiss claim seven on the grounds that Vanderhurst does not allege that he was a member of a constitutionally protected group or that he was treated differently than other similarly situated employees. Rather, Vanderhurst alleges that defendants deprived him of his constitutionally protected right to equal protection of the law by "intentionally and vindictively carrying out a campaign to divest Vanderhurst, as a member of an individual class, of his employment. . . ." Second Amended Complaint ¶ 161. I will deny the motion to dismiss claim seven.

■ "The equal protection clause is triggered when the government treats someone differently than another who is similarly situated." *Buckley Constr., Inc. v. Shawnee Civic & Cultural Develop. Auth.*, 933 F.2d 853, 859 (10th Cir.1991) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The more familiar equal protection claim asserts some invalid classification within which the plaintiff falls and typically fails where a plaintiff "does not allege a classification sufficient to invoke the equal protection clause." *Buckley Construction*, 933 F.2d at 859.

Here, a class-based equal protection infringement is not alleged. However, that

does not end my analysis. "The question . . . is whether the Equal Protection Clause protects not only against discrimination where victims are within an identifiable group, but also where the plaintiff alleges he is an individual victim of purposeful discrimination." *Norton v. Village of Corrales,* 103 F.3d 928, 933 (10th Cir.1996).

As the Tenth Circuit recognized in *Buckley,* the Equal Protection Clause protects not only against discrimination where victims within an identified classification or group are injured, but also where the plaintiff alleges "an element of intentional or purposeful discrimination" so as to invoke the clause to protect an individual victim. *Buckley,* 933 F.2d at 859, *quoting Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). In holding the claim defective in *Buckley,* the Tenth Circuit noted specifically that there was no allegation of such intentional or purposeful discrimination. *Id.* at 859.

Several years later, in an unpublished opinion, the Tenth Circuit relied on *Snowden and Buckley* in reversing the dismissal of an equal protection claim founded on allegations amounting to intentional or purposeful discrimination of an individual. *Smith v. Eastern New Mexico Medical Center,* 72 F.3d 138, 1995 WL 749712 (10th Cir.1995).

Generally, unpublished orders and judgments of the Tenth Circuit Court of Appeals are not binding precedents, except under the doctrines of law of the case, *res judicata,* and collateral estoppel. Also, citation of unpublished orders and judgments is not favored. 10th Cir. Rule 36.3 (eff. January 1, 1996). "Nevertheless, an unpublished decision may be cited if it has persuasive value with respect to a material issue that has not been addressed in a published opinion and it would assist in its disposition. . . ." *Id.*

In *Smith,* two plaintiffs, a vascular surgeon and a registered nurse/vascular technician, sued Eastern New Mexico Medical Center, a hospital where Dr. Smith had medical privileges and Ms. Smith operated a non-invasive vascular laboratory, and nine individual defendants claiming that the defendants had violated their civil rights to equal protection of the law. Plaintiffs alleged:

individual defendants who recommended the initial restriction of plaintiff Dr. Smith's privileges and the subsequent denial of their extension and/or who coerced plaintiff Dr. Smith into resigning, and/or terminated plaintiff Deborah P. Smith's vascular laboratory were guilty of fraud, malice and oppression and were motivated by a desire to promote their own improper economic interests and with a wanton disregard of the rights of plaintiffs or the interests of their patients.

*Smith v. Eastern New Mexico Medical Center,* 72 F.3d 138, 1995 WL 749712 at *5–6.

The *Smith* court expanded the basis for an equal protection claim to include claims by an individual if there are allegations of behavior amounting to intentional or purposeful discrimination toward an individual. *Smith v. Eastern New Mexico Medical Center,* 72 F.3d 138, 1995 WL at 749712 *8 (10th Cir. 1995) (unpublished decision attached). The Court's conclusion was based on the following analysis:

In *Esmail v. Macrane,* 53 F.3d 176, 178–180 (7th Cir.1995), the plaintiff alleged that a powerful public official violated the Equal Protection Clause by refusing to renew the plaintiff's license out of sheer vindictiveness. Citing *City of Cleburne,* 473 U.S. at 446–47, 105 S.Ct. 3249, the Seventh Circuit held that the individual plaintiff's complaint stated a claim by averring the vindictive action against him. Important for our analysis, in *Esmail,* Chief Judge Posner stated: "But neither in terms nor in interpretation is the clause limited to protecting members of identifiable groups." *Esmail,* 53 F.3d at 180 (emphasis added). The Seventh Circuit held that an equal protection claim was stated, reasoning that "[w]hat [the Equal Protection Clause] does require, and what *Esmail* may or may not be able to prove is that the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Id. See also Ciechon v. City of Chicago,* 686 F.2d 511, 522–24 & n. 16 (7th Cir.1982) (intentional act of invidious discrimination with no rational basis

and motivated by bad faith established equal protection claim asserted by single victim, without identification of a class of victims); *Zeigler v. Jackson*, 638 F.2d 776, 779–80 (5th Cir.1981) (distinctions between similarly situated individuals must be reasonable and not arbitrary in order to survive equal protection challenge). In none of these Seventh or Fifth Circuit cases was any classification or group identified as the target of the intentionally disparate treatment. Thus our Sister Circuits have held that showing "an element of intentional or purposeful discrimination" against one victim, *Buckley Construction*, 933 F.2d at 859, may establish an equal protection violation although a target group or classification is not identified.

Other circuits have expressed similar views. We find particularly persuasive the analysis in *Burt v. City of New York*, 156 F.2d 791 (2nd Cir.1946). There Judge Learned Hand analyzed *Snowden* and concluded that under that decision the plaintiff's allegations of "purposeful discrimination," "that defendants' treatment of plaintiff was actuated by personal hostility," and that defendants "singled [plaintiff] out for unlawful oppression" in denying his application for work as an architect, were sufficient to state an equal protection claim. Dismissal of plaintiff's civil rights complaint was reversed. *Id.* at 791–93. *See also Rubinovitz v. Rogato*, 60 F.3d 906, 910–11 (1st Cir.1995) ("in the absence of invidious discrimination or the abuse of a fundamental right, a party may establish an equal protection violation with evidence of bad faith or malicious intent to injure."); *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2nd Cir.1980) (selective enforcement of law may violate equal protection if based on "malicious or bad faith intent to injure a person"), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Shock v. Tester*, 405 F.2d 852, 855–56 (8th Cir.) (plaintiffs equal protection claim failed because he did not allege that acts of defendant officers were ones of intentional or purposeful discrimination.), *cert. denied*, 394 U.S. 1020, 89 S.Ct. 1641, 23 L.Ed.2d 45 (1969). *Cf. Cook v. City of Price, Carbon County,*

*Utah,* 566 F.2d 699, 701 (10th Cir.1977) (to show equal protection infringement when the discrimination is not aimed at a suspect class, 'a plaintiff must show intentional or purposeful discrimination.')(citing *Snowden*, 321 U.S. at 8, 64 S.Ct. 397).

Thus, in addition to shielding victims from discriminatory treatment of them as members of an identified class, the Equal Protection Clause affords protection to an individual injured by "intentional or purposeful discrimination," *Snowden*, 321 U.S. at 8, 64 S.Ct. 397, without identification of a class. Giving the complaint before us the favorable consideration required by *Conley v. Gibson* and our own precedents, we cannot uphold the dismissal on motion of the plaintiffs' equal protection claim here.

*Smith*, 1995 WL 749712 at *5–6.

In his complaint, Vanderhurst alleges, among other things, that defendants:

*"intentionally and vindictively* carr[ied] out a campaign to divest *Vanderhurst, as a member of an individual class,* of his employment and thereby humiliating him in a manner wholly unrelated to a legitimate state objective. This campaign was carried out in retaliation for Vanderhurst's exercise of his constitutional rights, and carried out as unequal governmental treatment because ... CMC administrators and CMC Board members harbored malignant animosity toward Vanderhurst."

Second Amended Complaint, ¶ 161 (emphasis added)..

I find persuasive the reasoning contained in *Smith* and the authorities relied on by the *Smith* court. Vanderhurst may or may not be able to prove such a case, but I am persuaded that he states an equal protection claim which should not be dismissed.

**B.** *Motion to strike certain allegations of the Second Amended Complaint*

Pursuant to Fed.R.Civ.P. 12(f), defendants move to strike certain allegations contained in Vanderhurst's Second Amended Complaint at ¶¶ 12, 18–23, 24 (first sentence only), 25, 31 (first two sentences only), 32–37, 39, 40, and 41. Def. Motion, p. 1.

Rule 12(f) provides that "[u]pon motion made by a party before responding to a pleading... the court may order stricken from any pleading any ... redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike are generally disfavored and the decision to grant a motion to strike rests within the sound discretion of the district court. *FDIC v. Isham,* 782 F.Supp. 524, 529 (D.Colo.1992).

Here, the underlying factual matters pleaded in the Second Amended Complaint are material and/or pertinent to factual and/or legal claims made by Vanderhurst. Consequently, in my discretion, I will deny the motion to strike.

## IV.

### Summary Judgment Motions

#### A. *Law*

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.,* 622 F.2d 516, 519 (10th Cir.1980); Fed.

R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. 2505; *Mares,* 971 F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White,* at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. Where, as here, the parties file cross motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. Nevertheless, summary judgment is inappropriate if disputes remain as to material facts. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 124 F.3d 1321, 1323 (10th Cir.1997).

#### B. *Defendants' motion for summary judgment*

##### 1. *Claim one for breach of contract*

Defendants contend they are entitled to summary judgment on claim one for breach of contract because in terminating Vanderhurst, all policies and procedure were followed "to the letter." Def. Reply Brief, p. 5. However, Vanderhurst is not challenging the procedures for termination contained in the Board grievance policy. Nor does he contend that defendants failed to follow the procedures "to the letter." Rather, in specif-

ically disavowing a challenged based on the grievance procedural process, Vanderhurst's breach of contract claim is premised on the factual basis underlying defendants' decision to terminate him. Resp. p. 42.

It is beyond dispute that a written employment contract, like any other contract, is a contract enforceable by the courts. Also, liability for breach of contract exists if the employee can prove all the elements of the formation and breach of a contract. *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987); *Tuttle v. ANR Freight System, Inc.* 797 P.2d 825, 827 (Colo.App.1990).

Here, there is no dispute about the existence of a written employment contract between the parties. However, there are numerous genuine factual disputes about Vanderhurst's conduct upon which defendants based his termination.

Defendants premise their defense to Vanderhurst's breach of contract claim on the contention that he was terminated for violations of CMC's Code of Ethics and/or sexual harassment policy. Where, as here, there are genuine factual disputes as to the ultimate determination of whether Vanderhurst's conduct violated the Code of Ethics and/or the sexual harassment policy, it is for the trier of fact to determine whether defendants breached their employment contract with Vanderhurst. *See Adams v. Frontier Airlines Federal Credit Union,* 691 P.2d 352 (Colo.App.1984). *See also Little Thompson Water Ass'n v. Strawn,* 171 Colo. 295, 466 P.2d 915, 917 (1970); *Bator v. Mines Development, Inc.,* 32 Colo.App. 320, 513 P.2d 220, 225 (1973).

### 2. *Claims two, three, and four*

#### a. *Colorado Constitution*

■ In claims two, three, and four, Vanderhurst alleges violations of the Colorado Constitution, Art. II, §§ 10 and 25. Second Amended Complaint, ¶¶ 133, 138, and 144. Defendants state that they are entitled to summary judgment on claims two through four to the extent that Vanderhurst relies on 42 U.S.C. § 1983 to enforce rights under the Colorado Constitution. S.J. Brief, pp. 16–17. However, Vanderhurst does not rely on § 1983 to assert his state constitutional claims. Resp. p. 51. Thus, defendants are not entitled to summary judgment motion on this basis. However, defendants also seek summary judgment on claims two through four on the grounds that under the circumstances of this case, there is no implied cause of action arising directly from the state constitution. I agree.

No statutory equivalent exists under Colorado state law to enforce the state constitution. Moreover, Colorado appellate courts have not recognized an implied cause of action to enforce the provisions of the Colorado Constitution. In *Board of County Commissioners of Douglas County v. Sundheim,* 926 P.2d 545 (Colo.1996), the Court addressed whether "this Court has the authority to recognize an implied damages action in cases where citizens allege that government entities have violated their state constitutional rights." *Id.* at 547. The Court concluded no such implied cause of action to enforce the Colorado Constitution should be recognized because:

> [w]hile it may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy, we agree with the approach taken by the court in *Kelley* that where other adequate remedies exist, no implied remedy is necessary.

*Id.* at 553 *citing Kelley Property Development, Inc. v. Town of Lebanon,* 226 Conn. 314, 627 A.2d 909 (1993).

Here, Vanderhurst has adequate remedies available pursuant to § 1983 for violations of the United States Constitution and for breach of contract, including damages. Also, Vanderhurst could have included additional claims such as intentional interference with contractual relations. Under these circumstances, I decline to recognize an implied state constitutional cause of action. *Sundheim,* 926 P.2d at 553. Hence, I will grant defendants' motion for summary judgment on claims two through four to the extent they are based on the Colorado Constitution.

#### b. *Claim two—deprivation of constitutional rights—§ 1983—free speech and academic freedom*

■ Defendants also seek summary judgment on Vanderhurst's claim two for viola-

tion of § 1983—deprivation of free speech and academic freedom. Vanderhurst argues that summary judgment for the defendant should not be granted because there are genuine issues of material fact to be determined before the First Amendment issue can be decided.

The conduct upon which CMC relies as the basis for Vanderhurst's suspension and termination is rife with sharply different and often contradictory "facts" relied upon and conclusions reached by CMC and the Peer Review Committee. Clearly, these factual disputes, including the context in which the conduct should be viewed, affect the outcome of Vanderhurst's First Amendment claim. Thus, summary judgment on claim two is not appropriate with one exception.

■ Vanderhurst's conduct in allowing sophomore students to address a freshman class regarding student evaluations of that class without his presence is not protected speech because I cannot impute the students' speech to Vanderhurst. Research reveals no authority for this result. Thus, I conclude this conduct does not implicate the First Amendment.

### c. *Claims three and four for violation of the Due Process Clause of the Fourteenth Amendment*

Vanderhurst claims that CMC's sexual harassment policy (claim three) and Code of Ethics (claim four) (collectively, Policies) are vague and provided inadequate notice of prohibited conduct and, therefore, are unconstitutional. I disagree.

In the First Amendment arena, vague laws offend three important values. First, they do not give individuals fair warning of what is prohibited. Second, lack of precise standards permits arbitrary and discriminatory enforcement. Finally, vague statutes encroach upon First Amendment freedoms by causing citizens to forsake activity protected by the First Amendment for fear it may be prohibited. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also, Hynes v. Mayor and Council of the Borough of Oradell,* 425 U.S. 610, 620–22, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *General Stores, Inc. v. Bingaman,* 695 F.2d 502, 503 (10th Cir.1982); *Hejira Corp. v. MacFarlane,* 660 F.2d 1356, 1365 (10th Cir.1981).

### i. *CMC's sexual harassment policy*

■ CMC's sexual harassment policy provides, in pertinent part:

> Sexual harassment occurs when unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature:
>
> .     .     .     .     .
>
> 3. Has the purpose or effect of interfering with an individual's education or work performance or creating an intimidating, hostile, or offensive educational or working environment....

CMC Policy 60.1. Further, the Policy provides:

> The College recognizes its responsibility to make every practical effort to maintain a work and educational environment free of sexual harassment, intimidation, or both. For purposes of these regulations, examples of conduct which may constitute sexual harassment, and are outside the standards of professional conduct include, but are not limited to:
>
> 3. Verbal abuse or kidding that is sex-oriented and considered offensive by another individual. This includes comments about an individual's body or appearance (where such comments go beyond a mere compliment), off-color jokes that are clearly unwanted or considered offensive by others, or any other tasteless, sex-oriented comments, innuendos, or offensive actions....
>
> 5. Participation in fostering a work or educational environment that is generally intimidating, hostile, or offensive because of unwelcome or unwanted sexually oriented conversation, suggestions, requests, demand, physical contacts, or attention or displays [of] sexually oriented pictures, drawings, calendars or jokes....

*Id.* at 60.2

Under the standards enunciated in *Grayned,* CMC's sexual harassment policy is not constitutionally vague. The policy con-

tains definitions of pertinent words so that ordinary people can understand what conduct is prohibited and may act accordingly. Also, the specificity of the standards discourage arbitrary and discriminatory enforcement by those who apply the policies.

### ii. *CMC's Code of Ethics*

■■■ CMC's Code of Ethics provides, in pertinent part:

#### SECTION 40: CODE OF ETHICS

#### 40.2 PRINCIPLE I -COMMITMENT TO THE STUDENT

The educators [sic] objective is to move each student toward the realization of his or her potential as a person, and as an effective citizen. The educator therefore works to stimulate the spirit of inquiry, the acquisition of knowledge and understanding, and the thoughtful formulation of worthy goals. In fulfilling this obligation to the student, the educator:

A. Will not deliberately suppress or distort subject matter;

B. Will make reasonable effort to protect our students from conditions harmful to learning or to their health and safety;

C. Will conduct professional business in such a way that the student is not exposed to unnecessary embarrassment or disparagement;

D. Will not discriminate against any student in relation to participation in any College related programs;

E. Will not use professional relationship with students for private or personal advantage; [lined through, Ex. 5 p. 2]

F. Will keep in confidence information that has been obtained in the course of professional service, unless disclosure serves professional purposes or is required by law.

Ex. 5, pp. 1–2.

Unlike its sexual harassment policy, the Code of Ethics does not contain detailed descriptions and lists of specific prohibited conduct. However, " 'the Constitution does not require impossible standards' ; all that is required is that the language 'conveys suffi-

ciently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' " *Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1 L.Ed.2d 1498(1957) (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877(1947)). The Code of Ethics is written in plain language which is easily understandable and non-technical. Therefore, as a matter of law, CMC's sexual harassment policy and Code of Ethics are not unconstitutionally vague. I will grant defendants' summary judgment motion on claims three and four and deny Vanderhurst's cross-motion.

### 3. *Claim seven for violation of the right to equal protection of the law*

■■■ Based on my analysis in section III. A(1), CMC's motion for summary judgment on claim seven is denied to the extent it is premised on the theory that an individual is not entitled to relief unless he is a member of a protected class. Moreover, Vanderhurst has submitted evidence that CMC's decision to terminate him was vindictive. *See, e.g.,* Ex. AL, p. 137 (CMC Vice–President Robert Evans referred to the Peer Review Committee as a "peer protection committee"); Ex. AM, p. 93 (adversarial relationship existed between Vanderhurst and the CMC administration), p. 120 (Vanderhurst specifically excluded from hiring process for other veterinary technology faculty [Ex. P] because "Vanderhurst needed to know he didn't have the authority anymore"). Ex. 1, ¶¶ 8–10 (in response to a comment from an adjunct faculty member that there "seemed to be a disease in the Vet Tech program," CMC administration Dr. Bayer laughed and responded that "the diseased part should be cut off. . . . Just lop it off and get rid of the diseased part."); and Ex. AP, p. 88 (CMC administrator Evans stated one to two years before Vanderhurst's termination that "all the problems in the veterinary technology program would be solved if Vanderhurst was terminated").

Also, Vanderhurst presents evidence that other similarly situated professors and instructors were treated differently. For example, there is evidence that Van Dyne used vulgar words in her classroom before and

after Vanderhurst was placed on suspension and recommended for termination. Def. Exs. H, pp. 253, 348; S; T; and AN. And, after Vanderhurst's suspension, an offensive photocopy was posted in the classroom of his successor without any complaints made or action taken. Def. Ex. AI, pp. 42, 48. Under these circumstances, I will deny defendants' summary judgment on claim seven.

### 4. Claim eight for copyright infringement

■ Defendants seek summary judgment on Vanderhurst's claim eight for copyright infringement. I will grant the motion.

Although more broadly defined in his Second Amended Complaint, see ¶¶ 69–71, 164, in Vanderhurst's summary judgment response brief, he narrowed the scope of claim eight for copyright infringement to pertain solely to the "Veterinary Technology Outline" (Outline) ... initially published in the spring of 1995. Resp. p. 70.

The Copyright Act of 1976 (Act) provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The Act creates an important exception for "works made for hire." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). If the work is for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary. § 201(b).

Pursuant to § 101, a work is "for hire" when:

(1) a work is prepared by an employee within the scope of his or her employment; or

(2) a work is specially ordered or commissioned for use as ... an instructional test or ... as answer material for a test ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. Defendants do not contend that the Outline falls within § 101(2).

The question, then, is whether the Outline is a "work prepared by an employee within the scope of his or her employment" under § 101(1). The Act does not define these terms. However, in *Reid,* the Court applied agency law to the Act. *Id.* at 751, 109 S.Ct. 2166. (agency principles applicable to determine employment status and whether disputed work within scope of employment).

The term "scope of employment" has been defined as:

those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods ... of carrying out the objectives of the employment.

Restatement (Second) Agency §§ 228–229; *United States v. Smith,* 810 F.2d 996 (10th Cir.1987). Other factors which may be considered are whether: 1) it is the kind of work the person is employed to perform; 2) the work occurs substantially within work hours; and 3) the work is actuated, at least in part, by a purpose to serve the employer. Restatement (Second) Agency, § 228; Nimmer on Copyright pp. 5–33 (1997).

Here, Vanderhurst alleges that the outlines were created "in the course of teaching at CMC." Second Amended Complaint, ¶ 69. Further, CMC policy § 110.1 states that a faculty member's duties include "professional service activities [including], but not limited to, course, program and curriculum development [and] course preparations...." Def. Ex. 20.

It is undisputed that Vanderhurst prepared the Outline on his own time with his own materials. However, there is no genuine dispute that Vanderhurst's creation of the Outline was connected directly with the work for which was employed to do and was fairly and reasonably incidental to his employment. Further, creation of the Outline may be regarded fairly as one method of carrying out the objectives of his employment. *See,* Restatement (Second) Agency, § 228. I conclude, therefore, that pursuant to the "work for hire" doctrine, as of 1995, any copyright remaining in the Outline did not belong to Vanderhurst. Thus, I will grant defendants' motion for summary judgment on claim eight.

Based on my rulings, the claims remaining for trial are claims one, two, and seven.

Accordingly, IT IS ORDERED that:

1. defendants' motion to dismiss claims five and six is DENIED as moot;

2. defendants' motion to dismiss claim seven for deprivation of the constitutional right to equal protection under 42 U.S.C. section 1983 is DENIED;

2. defendants' motion to strike certain allegations of the Second Amended Complaint is DENIED;

3. defendants' motion for summary judgment on claim one for breach of contract is DENIED;

4. defendants' motion for summary judgment on claims two, three, and four is GRANTED to the extent the claims are based on the Colorado Constitution;

5. defendants' motion for summary judgment on claim two for deprivation of free speech and academic freedom is GRANTED IN PART and DENIED IN PART;

6. defendants' motion for summary judgment on claim three pursuant to 42 U.S.C. § 1983 for violation of the due process clause of the Fourteenth Amendment based on defendants' sexual harassment policy is GRANTED;

7. defendants' motion for summary judgment on claim four pursuant to 42 U.S.C. § 1983 for violation of the due process clause of the Fourteenth Amendment based on defendants' Code of Ethics is GRANTED;

8. defendants' motion for summary judgment on claim seven pursuant to 42 U.S.C. § 1983 for violation of the right to equal protection is DENIED;

9. defendants' motion for summary judgment on claim eight for copyright infringement is GRANTED; and

10. plaintiff's cross-motion for summary judgment on claims three and four is DENIED.