2009 Ark. App. 840

**Jerry M. TURLEY, Appellant**

v.

**Gerald R. STALEY, Billie J. Staley, and M. Randy Rice, Appellees.**

No. CA 08–825.

Court of Appeals of Arkansas.

Dec. 9, 2009.

822

The Henry Firm, P.A., Little Rock, by: Matthew M. Henry, for appellant.

H. Oscar Hirby, Little Rock, for appellees Gerald R. Staley and Billie J. Staley.

M. Randy Rice, U.S. Bankruptcy Trustee, Eastern District of Arkansas, for appellee M. Randy Rice.

KAREN R. BAKER, Judge.

Appellant Jerry Turley appeals from an order requiring him to relinquish forty-five acres of land after making more than eleven years of installment payments to appellees Gerald Staley, Billie Staley, and Randy Rice. For the reasons explained below, we reverse and remand.

On July 7, 1995, Gerald and Billie Staley contracted to sell forty-five acres of wooded, undeveloped property to Jerry Turley for $65,250. Turley made a $6525 down payment and promised to pay the remaining $58,575, plus interest, in 180 monthly installments of $578.29. Turley also agreed to pay property taxes within thirty days after presentation of a bill by the Staleys. The contract provided that the installment payments were due on the first of each month, with late charges for overdue payments of more than ten days. It also provided that there would be no penalty for prepayment of the principal; that the proceeds from any timber cut from the property would be paid to the Staleys and applied to the principal balance of Turley's debt; and that, upon payment of all installments and taxes, the Staleys would convey the deed to Turley. In addition, the contract contained the following relevant clause:

(e) *Time of Essence.* Time is of the essence of this AGREEMENT, and if BUYER defaults in payment of any installments of principal or interest for a period of thirty (30) days or fails to pay any taxes or assessments when due, SELLERS, at their sole option, may either declare the entire debt with interest due and payable or rescind this AGREEMENT, and in the event of rescission all moneys paid by BUYER shall be taken and retained by SELLERS not as a penalty but as rent of the property, and the relationship of the parties thereafter shall be that of landlord and tenant at a rental of [$578.29] per month; and thereupon SELLERS after notice may demand possession of the property and BUYER agrees to sur-

render immediately peaceable possession. No delay in the exercise of the options herein shall be construed as a waiver of such right, but the same may be exercised at any subsequent time. . . .

Just over a year into the contract, Turley (through his father, Danny Rothstein) began making untimely payments. The late payments became a regular feature of the parties' dealings—Turley frequently fell several months behind, then made two, three, or four payments at once, along with late fees, to become current.

Gerald and Billie Staley divorced in 2001 or 2002, and the court awarded Billie all the installment payments for approximately four years. The decree required Billie to notify Gerald if Turley was more than ten days late on a payment, and required Gerald to make the payment to Billie if Turley missed a third payment. According to Gerald, this provision could have been placed in the decree because of Turley's history of late payments.

In 2004, Billie Staley filed for Chapter 7 bankruptcy, and Turley began making all payments due her to bankruptcy trustee Randy Rice. Thereafter, Rice also accepted late payments from Turley in March and December 2005.

By mid–2006, Gerald Staley began receiving half of each installment payment under the terms of the divorce decree. At that time, Turley once again fell several months in arrears. However, Turley caught up on the payments and additionally paid Gerald $7,706.95 from proceeds of a timber sale, which Gerald applied to the "end balance," by shortening the payoff date to April 2009. As of October 2006, Turley was again several months behind on his payments, to both Gerald Staley and Randy Rice. On October 2, 2006, Rice sent the following letter to Turley:

As you know, you have failed to make your monthly payment on the real property that is due for the last three (3) months. This constitutes a breach of contract in accordance with your agreement.

This is notice to you of my intent to take immediate possession of the property. I am therefore demanding that you officially turn over this property to me, as trustee, for liquidation. I am requesting that this be done on or before October 15, 2006. If you have not turned over the property to me by that date, I will file papers with the Court asking that the Court [order] you to turn over the property and that you be ordered to vacate.

A few days after receiving Rice's letter, Turley remitted to Rice and to Gerald Staley sufficient payments to bring him current through the month of October. On October 9, 2006, Rice wrote the following letter to Turley:

This is to confirm our conversation on October 6, 2006, whereby I agreed to allow you to catch up the payments that you are in arrears on the real property. You acknowledged that you did receive my earlier letter dated October 2, 2006. You also confirmed that all payments due to Mr. Staley had been forwarded to him. I only agreed to allowing you to catch up your payments because you stated that you were mailing a payment to me in the amount of $867.44. This amount is equal to one-half of the payment due for the months of June, July and August 2006. You informed me that you mailed the other one-half payment to Mr. Gerald Staley already for this period of time. This payment was supposed to be placed in the mail on October 6, 2006.

Additionally, we agreed that, upon receipt of this letter, you would immediately mail a payment in the amount of

$578.29 to me. This amount is equal to one-half payment of your regular note for the months of September and October 2006. Finally, you were instructed to mail one-half of all future payments to my address until such time as I notified you in writing that this process should stop. . . .

You stated to me that Mr. Staley had instructed you to mail him the full payment for the next fourteen (14) months. DO NOT DO THAT. You will not be given credit for Mrs. Staley's payment if you follow that procedure. Also, I will proceed to foreclose on this property if these payments are not received promptly. I have advised Mr. Staley of my demand to you. Furthermore, I am sending a copy of this letter to him and to Mrs. Staley so that they will both know exactly what I have instructed you to do with the portions of funds that are supposed to be received by the bankruptcy estate. . . .

Thereafter, Turley made no further payments on the contract. By February 2007, he was again three months in arrears with another due date approaching.

In late January or early February 2007, Gerald Staley sent Turley an undated letter, stating that he had spoken with Danny Rothstein in the last week of January and that Rothstein had promised to bring the payments up to date but had not done so. Staley told Turley the following:

I am [obligated] by the divorce decree that these payments be made on time to Billie Staley and myself and simply cannot tolerate the way these payments are being made anymore.

If Billie and I do not have in our hands by Monday, February 12, 2007 payments to bring your account current (four months) plus [accumulated] late charges . . . without any further notice, I will turn this contract over to an attorney for legal action.

This is final notice on this matter with the intended [sic] to collect a debt.

Turley did not forward the payments, and Staley wrote to him again on February 15, 2007, stating that the four-month arrearage was "not acceptable" and that "due to the payment history on this contract and other points of interest, I no longer wish to carry this note." Staley declared the contract "terminated and forfeited," and he gave Turley until March 20, 2007, to vacate the premises. Rice wrote to Turley on March 5, 2007, stating that he would join in Staley's effort to retake the property.

According to Turley, he tried to contact Rice and Gerald Staley in February to pay off the contract in full, but they did not return his calls. As a result, Turley sued Rice and the Staleys on March 20, 2007, to quiet title to the property and to interplead $14,698.17, which he contended was the balance due on the land sale. Rice answered that Turley was in default on the contract and counterclaimed for Turley's eviction. Turley responded that the parties to the contract had acquiesced to his late payments as a course of dealing; that Rice had no standing to evict him from the property; and that a default judgment should be entered against the Staleys because they failed to answer his complaint. The court refused to enter a default judgment and did not rule on the issue of Rice's standing. Later in the proceedings, Gerald Staley filed a complaint seeking possession of the property based on Turley's failure to make payments when due. The court treated Staley's pleading as a counterclaim, and the issues were thus joined for trial.

During the bench trial, Gerald Staley testified that he had attempted to work with Turley over the years and had al-

lowed Turley to make late payments. However, Staley said that he never told Turley that he would always make those arrangements. He said that he was constantly negotiating with Turley during the course of the contract and that he finally got "fed up" and wanted his land back. According to Staley, he spoke with Danny Rothstein in February 2007 about Rothstein's desire to pay off the balance, but Staley said that he had engaged in those types of payoff discussions from "day one." He said that, when Turley began calling him after the February 15, 2007 letter, he did not answer Turley's calls. Staley also testified that he had sent tax statements to Turley but that Turley had failed to pay 2005 and 2006 taxes, causing Staley to have to pay them.

Danny Rothstein testified that he knew that the installment payments were due on the first of the month and that he was aware of the Staleys' options under the contract. He also said that Mrs. Staley had told him that she needed to receive her payments on time and that she was depending on those funds. However, Rothstein said that he typically made some payments on time while making others two to four months at a time, due to his seasonal work as a swimming-pool contractor. According to him, Gerald Staley told him that this "wasn't a problem." Rothstein also testified that he contacted Staley in January or February 2007 to tell him he would have the payoff amount in two or three weeks. However, he said, by the time he obtained the funds, Staley had already sent the February 15, 2007 letter.

Jerry Turley testified that he was aware that payments under the installment contract were delinquent after thirty days and that the contract contained an option for repossession by the Staleys. He also said that he had previously mentioned a possible payoff of the contract to Randy Rice

and that Rice had told him that payments needed to be "kept up" until he could make the payoff. Turley said that he tried, unsuccessfully, to contact Rice and Gerald Staley about paying off the contract in February 2007, and he provided cell-phone records of several calls he had made to them between February 16 and 21, 2007. However, he said that he did not have the payoff money until the middle of February, and he acknowledged that his calls to Rice and Staley were made after Staley's February 15, 2007 letter.

Billie Staley testified that she had requested timely payments from Danny Rothstein. She stated that she never indicated that it was acceptable for the payments to be late and that she never waived any rights under the contract.

Following the hearing, the court denied Turley's petition to quiet title, granted Rice's counterclaim for eviction, and granted Gerald Staley's complaint for possession. The court ordered Turley to immediately return the property to Rice and the Staleys and ordered a refund of all real-estate taxes that Turley had paid. Turley now appeals and argues (1) that Rice did not have standing to evict him, (2) that the circuit court erred in refusing to enter a default judgment against the Staleys, (3) that Rice and the Staleys modified the land-sale contract by accepting late payments, (4) that equity abhors a forfeiture, and (5) that he was entitled to file a quiet-title action to assert his rights in the property.

## I. *Standing*

█  Turley argues first that bankruptcy trustee Randy Rice did not have standing to evict him because Rice did not have possession of, or title to, the real property. Turley's argument appears to be based on Rice's admission below that the land itself was not "in receivership," which Turley

interpreted to mean was not part of the bankruptcy estate.

Questions of standing are matters of law, and we review them de novo on appeal. *See Bibbs v. Comm. Bank of Benton,* 375 Ark. 150, 289 S.W.3d 393 (2008). However, in this instance, we cannot reach the merits of Turley's argument. Though he raised the issue of standing below, he did not obtain a ruling from the circuit judge as to whether Rice had standing. It was Turley's burden to bring the issue to the trial court's attention for a ruling. *Britton v. Floyd,* 293 Ark. 397, 738 S.W.2d 408 (1987). Questions left unresolved are waived and may not be relied upon on appeal. *Id.; see also Quapaw Cent. Bus. Imp. Dist. v. Bond–Kinman, Inc.,* 315 Ark. 703, 870 S.W.2d 390 (1994); *Peoples Bank & Trust Co. v. Wallace,* 290 Ark. 589, 721 S.W.2d 659 (1986) (refusing to consider the issue of standing where the appellant did not obtain a ruling at the trial level). We therefore decline to address Turley's standing argument.

## II. *Default Judgment*

Next, Turley argues that the circuit court should have granted a default judgment against Gerald and Billie Staley because they did not answer his complaint. It is undisputed that Gerald and Billie Staley were served with Turley's petition and that they did not file a timely answer. However, their codefendant, Randy Rice, did file a timely answer.

Arkansas has long recognized the common-defense doctrine, in which answer of one defendant inures to the benefit of his codefendants. *See Davenport v. Lee,* 348 Ark. 148, 72 S.W.3d 85 (2002). In determining whether the common-defense doctrine is applicable, we focus on whether the answer of the non-defaulting defendant states a defense that is common to all defendants. *Id.* A de-

fense that applies equally to the other defendants, or even a general denial of the allegations in the complaint, may constitute a common defense. *See Sutter v. Payne,* 337 Ark. 330, 989 S.W.2d 887 (1999). In the present case, Randy Rice answered that Turley did not have the right to quiet title in the property; that Turley had no legal title; that Turley was in default on his payments under the land-sale contract; and that Turley had been notified of an intent to retake possession of the land. These are the same defenses applicable to the Staleys, and we see no reason why Rice's answer should not inure to their benefit under the common-defense doctrine. We therefore cannot say that the circuit court abused its discretion in denying a default judgment. *See Brooks v. Farmers Bank & Trust Co.,* 101 Ark. App. 359, 276 S.W.3d 727 (2008) (citing the abuse-of-discretion standard in reviewing a circuit court's decision to deny a default judgment).

## III & IV. *Course of Dealing and Forfeiture*

Turley argues that he was not in breach of the land-sale contract because the parties modified the contract terms through a course of dealing by accepting late payments. He also argues that the trial court's direction that he relinquish the property to Rice and the Staleys after having made over eleven years of payments violates the maxim that equity abhors a forfeiture. Turley's arguments are well taken.

A seller may waive his right to compliance with the terms of the contract where he has established a course of dealing by accepting late payments from the buyer. *See Ford Motor Credit Co. v. Ellison,* 334 Ark. 357, 974 S.W.2d 464 (1998). The waiver remains in effect until such

time as the seller notifies the buyer that the seller will no longer accept late payments and will henceforth require strict compliance with the contract. *Id.; see also Mercedes–Benz Credit Corp. v. Morgan,* 312 Ark. 225, 850 S.W.2d 297 (1993); *Duncan v. Malcomb,* 234 Ark. 146, 351 S.W.2d 419 (1961). Waiver is a question of fact, and we will not set aside a trial judge's finding of fact unless it is clearly erroneous. *Bright v. Gass,* 38 Ark.App. 71, 831 S.W.2d 149 (1992). A finding is clearly erroneous when, although there is evidence to support it, we are left with the firm conviction that a mistake has been committed. *See Powhatan Cemetery, Inc. v. Colbert,* 104 Ark.App. 290, 292 S.W.3d 302 (2009).

We firmly believe that a mistake occurred in this case. Between 1996 and 2006, the Staleys accepted late payments with regularity and without repercussions to Turley, despite their contractual right to insist on the full balance due or to rescind the agreement. Similarly, bankruptcy trustee Randy Rice accepted late payments from Turley in 2005 and 2006 with no consequence to Turley other than late fees. This conduct clearly established a course of dealing at variance with the terms of the contract, and under the holdings in *Ford Motor Credit, Mercedes–Benz Credit Corp.,* and *Duncan, supra,* Rice and the Staleys waived their right to the contractual remedies for late payments. They could have reinvigorated the contract by notifying Turley that they would no longer accept late payments and that they would henceforth demand strict compliance with the contract's payment terms. But on this requirement, Rice and the Staleys fell short.

Such notice to Turley, if it can be said to exist in this case, could only be found in Rice's October 2006 letters or Gerald Staley's February 2007 letters. However, as we read the letters, they did not bring home to Turley, prior to the declaration of default, that the course of dealing that had persisted for ten years was at an end and that the contract would thereafter be strictly enforced. Rice's first letter charged Turley with breach of contract and threatened repossession based on Turley's overdue payments. Yet, within days of writing the letter, Rice accepted Turley's late payments. Rice's second letter mentions the possibility of foreclosure. But that threat appears to have been directed at the possibility that Turley might have made a full month's payment to Gerald Staley rather than splitting it between Staley and Rice. Simply put, Rice's letters did not clearly inform Turley that the parties would no longer accept late payments and that the terms of the contract would be strictly adhered to from then on. Likewise, Gerald Staley's letters to Turley, while they expressed dissatisfaction with Turley's payment arrearage, did not abandon the parties' ten-year course of dealing and inform Turley of a reinstatement of contractual terms in a manner sufficient to retreat from such a lengthy practice. *See Mercedes–Benz Credit Corp., supra.*

Furthermore, we base our decision not just on Rice's and the Staleys' failure to renounce from their waiver, but also on the inequity of the forfeiture in this case. Forfeitures are not favorites of our law, and equity will sometimes offer relief against a forfeiture. *See Little Rock Granite Co. v. Shall,* 59 Ark. 405, 27 S.W. 562 (1894); *Taylor v. Eagle Ridge Dev., LLC,* 71 Ark.App. 309, 29 S.W.3d 767 (2000). In this case, Turley made his last installment payment in October 2006. By that point he had paid, on the original fifteen-year, $65,250 contract, a down payment of $6525; over eleven years of monthly installments; and an additional

$7,706.95 from timber sales, all of which would have allowed him to pay off the contract with a final installment in April 2009. In March 2007, Turley interpleaded the amount he believed would pay off the contract in full. Yet, the court required him to forfeit both the land and the thousands of dollars in payments that had been accepted by Rice and the Staleys, without regard to whether the payments were late. Given the Staleys' long history of accepting late payments, the length of time over which Turley made the payments, and the ready presence of payoff funds by virtue of Turley's interpleader, forfeiture could have and should have been fairly and equitably avoided in this case.

We would be remiss if we did not acknowledge that the land-sale contract in this case contains what is commonly referred to as a nonwaiver clause, even though the parties devote no significant discussion to this topic in their briefs. The contract provides that "[n]o delay in the exercise of the options herein shall be construed as a waiver of such right, but the same may be exercised at any subsequent time...." While a non-waiver clause may be upheld, see *Interstate Business Men's Accident Ass'n v. Greene,* 132 Ark. 546, 201 S.W. 799 (1918), we must also consider, and weigh equally, the full force and effect of the parties' conduct under the circumstances of this case. As our supreme court recognized in *Berry v. Crawford,* 237 Ark. 380, 383, 373 S.W.2d 129, 131 (1963) (emphasis added) (omitting internal citations):

> Parties may enter into a valid contract relative to the sale of land whereby they may provide that time of payment shall be of the essence of the contract, so that the failure to promptly pay will work a forfeiture. But the final effect of such an agreement will depend on the actual intention of the parties, as evinced by their acts and conduct; and such a breach of the contract as would work a forfeiture may be waived or acquiesced in. The law will strictly enforce the agreement of the parties as they have made it; *but, in order to find out the scope and true effect of such agreement, it will not only look into the written contract which is evidence of their agreement, but it will also look into their acts and conduct in the carrying out of the agreement, in order to fully determine their true intent.* It is a well settled principle that equity abhors a forfeiture, and that it will relieve against a forfeiture when the same has either expressly or by conduct been waived.

## V.  *Quiet Title*

For the above-stated reasons, we reverse and remand the circuit court's order directing Turley to turn the land over to Rice and the Staleys. We anticipate that, upon remand, the court will determine the amount owed by Turley to pay off the contract, as there is some dispute on this subject. We further anticipate that the court will accept Turley's interpleader of that amount, then resolve the question of how to divide it among the appellees, at which point Turley's title in the land may be quieted.

Reversed and remanded.

PITTMAN and KINARD, JJ., agree.