2010 Ark. 246

**Mose MINOR, Appellant,**

v.

**CHASE AUTO FINANCE CORPORATION,
Appellee.**

No. 09–801.

Supreme Court of Arkansas.

May 20, 2010.

Sanford Law Firm, PLLC, by: Vanessa Kinney, Russellville, for appellant.

Kutak Rock LLP, by: David L. Williams and Katherine M. Hingtgen, Little Rock, for appellee.

RONALD L. SHEFFIELD, Justice.

The Arkansas Court of Appeals certified this case to us pursuant to Arkansas Supreme Court Rule 1–2(b)(1), (4), and (5) (2009), as a case involving an issue of first impression, having a substantial public interest and needing clarification or development of the law. We have been asked to determine whether nonwaiver and no-unwritten-modifications clauses in a financing agreement preclude a creditor from waiving future strict compliance with the agreement by accepting late payments. In *Mercedes–Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993), this court explicitly reserved ruling on this question until it had been properly raised and argued in an appropriate case. The question is now ripe for our review.

On March 15, 2003, Appellant, Mose Minor (Minor), entered into a Simple Interest Motor Vehicle Contract and Security Agreement with Appellee, Chase Auto Finance Corporation (Chase), to finance the purchase of a 2003 Toyota Tundra. By the terms of the agreement, Minor was to make sixty-six payments of $456.99 on the fourteenth of each month. The payments would start on April 14, 2003, and end on September 14, 2008. The agreement also included the following relevant provisions:

G. Default: If you breach any warranty or default in the performance of any promise you make in this contract or any other contract you have with us, including, but not limited to, failing to make any payments when due, or become insolvent, or file any proceeding under the U.S. Bankruptcy Code, ... we may at our option and without notice or demand (1) declare all unpaid sums immediately due and payable subject to any right of reinstatement as required by law (2) file suit against you for all unpaid sums (3) take immediate possession of the vehicle (4) exercise any other legal or equitable remedy.... Our remedies are cumulative and taking of any action shall not be a waiver or prohibit us from pursuing any other remedy. You agree that upon your default we shall be entitled to recover from you our reasonable collection costs, including, but not limited to, any attorney's fee. In addition, if we repossess the vehicle, you grant to us and our agents permission to enter upon any premises where the vehicle is located. Any repossession will be performed peacefully.

. . . .

J. Other Agreements of Buyer: ... (2) You agree that if we accept moneys in sums less than those due or make extensions of due dates of payments under this contract, doing so will not be a waiver of any later right to enforce the contract terms as written.... (12) All of the agreements between us and you are set forth in this contract and no modification of this contract shall be.valid unless it is made in writing and signed by you and us....

K. Delay in Enforcement: We can delay or waive enforcement of any of our rights under this contract without losing them.

Minor's first payment was late, as were several subsequent payments. At times he failed to make any payment for months. Chase charged a late fee for each late payment, and sent several letters requesting payment and offering to assist Minor with his account. Chase also warned Minor that continued failure to make payments would result in Chase exercising its legal options available under the agreement, including repossession of the vehicle. Minor claims he never received these letters. At one point, Minor fell so far behind in his payments that Chase was on the verge of repossessing the vehicle. However, on October 19, 2004, the parties agreed to a two-month extension of the agreement, such that the final installment would be due on November 14, 2008. The extension agreement indicated that all other terms and conditions of the original contract would remain the same.

On November 2, 2004, Minor filed for Chapter 7 bankruptcy in the Eastern District of Arkansas. In his petition, Minor stated that the value of the vehicle was $5000.00.[1] On February 24, 2005, Chase

---

1. Minor later asserted, when he testified before the circuit court, that this amount was a mistake and a significant understatement. It has also been said by both parties in their arguments and in testimony before the circuit court that Minor did not include his debt to Chase in the petition. This statement is inconsistent with the bankruptcy filing since

sent Minor a letter acknowledging that Minor's debt to Chase had been discharged in bankruptcy. The letter further stated that Chase still had a valid lien on the vehicle, and if Minor wished to keep the vehicle, he would have to continue to make payments to Chase. Otherwise, Chase would repossess the vehicle. Chase sent a similar letter to Minor on May 22, 2006, and to Minor's bankruptcy attorney on November 16, 2004. Minor claimed he never received any of these letters.

On September 28, 2006, a repossession agent, Joshua Niles of Chamras Asset Recovery Specialists, arrived at Minor's home some time in the afternoon to repossess the vehicle. The ⌊4⌋repossession agent checked the VIN number of the vehicle and began to hoist it on his truck. There were no fences, gates, or garages barring the agent's access to the vehicle. When Minor objected to the repossession, the agent gave him a telephone number for Chase to call to obtain more information. Minor returned to his house to make the phone call, and spoke to a representative of Chase, who told him that Chase was repossessing the car because he was three months behind on his payments. Minor objected to the Chase representative and insisted that he could provide proof of payment in the form of money-order receipts. The repossession agent waited outside for several minutes, but when Minor did not return from inside his house, the agent removed Minor's possessions from the vehicle and towed it away. Chase sold the vehicle. The amount of the purchase price was reflected on Minor's account on November 17, 2006.

On January 7, 2008, Minor filed a complaint against Chase in the Johnson County Circuit Court. In the complaint, Minor alleged that, during the course of the contract, the parties had altered the provisions of the contract regarding Chase's right to repossess the vehicle and Chase had waived the right to strictly enforce the repossession clause. Minor further claimed that the repossession agent committed trespass and repossessed the vehicle forcibly, without Minor's permission, and through trickery and deceit, in violation of Arkansas Code Annotated section 4–9–609(b)(2) (Repl.2001). Also, Minor asserted that he was not in default on his payments, pursuant to the repayment schedule, at the time Chase authorized repossession. Therefore, according to Minor, Chase committed conversion, and ⌊5⌋breached the Arkansas Deceptive Trade Practices Act, specifically Arkansas Code Annotated section 4–88–107(a)(10) (Supp. 2007), and enhanced by Arkansas Code Annotated section 4–88–202 (Repl.2001), because Minor is an elderly person. Minor sought compensatory and punitive damages.

A jury trial was held on February 19, 2009. At the close of Minor's case, Chase moved for a directed verdict. Chase argued that Minor had not asserted sufficient grounds for an award of punitive damages because the act of conversion, alone, does not constitute sufficient grounds for an award of punitive damages, and Minor had not provided any evidence that there had been a breach of the peace. Chase further maintained that, by Minor's own admission when he testified before the circuit court, he was at least three payments past due at the time of the repossession. Therefore, under the terms of the contract, Chase asserted that it had a right to repossess the vehicle peacefully, and Minor's argument that he should have re-

Chase is listed in the creditor matrix and in the schedule of creditors holding unsecured nonpriority claims in Minor's petition, though the amount indicated as owed to Chase in the petition is significantly less than the amount actually owed.

ceived notice that Chase would require strict compliance with the contract failed because the contract included nonwaiver and no-unwritten modification clauses. Chase argued that the case upon which Minor relied, *Mercedes–Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993), was distinguishable, and instead the holding of *Westlund v. Melson*, 7 Ark.App. 268, 647 S.W.2d 488 (1983), indicated that Chase's acceptance of late payments had not effected a waiver of its right to demand future strict compliance. Finally, Chase asserted that Minor had failed to show that Chase had committed deception or false pretense in order to sustain a claim for a violation of the Arkansas Deceptive Trade Practices Act.

In response, Minor argued that the jury should be allowed to rule on the evidence because there was a question of whether Minor was in default at the time of the repossession, since the evidence indicated that Chase had failed to properly credit his account. What is more, Minor maintained that Chase was aware of this error but repossessed the vehicle anyway, against Minor's will, an action that constituted an intentional and willful violation of Minor's rights, warranting an award of punitive damages. Also, according to Minor, his request that the repossession agent stop the repossession constituted a confrontation rising to the level of a breach of the peace. Further, Minor asserted that he had presented sufficient evidence that he had a right to possess the vehicle, and that, by continually accepting late payments, Chase had established a course of dealing that modified the contract and waived Chase's right to repossess the vehicle without notice to Minor that Chase would require strict compliance in the future. Minor cited *Mercedes–Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993), and *Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464

(1998), as support for this position. Finally, Minor argued that Chase had violated the Arkansas Deceptive Trade Practices Act by repossessing the vehicle over Minor's objections and failing to timely acknowledge payments Minor had made.

After hearing these arguments, the circuit court ruled that Minor had presented no evidence that the conduct of Chase or the repossession agent constituted grounds for punitive damages; that by the express terms of the contract Chase's acceptance of late payments did not effect a waiver of its rights in the future; that at the time of repossession, Minor was behind in his payments and in breach of the contract; that Chase had the right under the contract to repossess the vehicle and did not commit conversion; and that there was no evidence to support a claim that Chase had violated the Arkansas Deceptive Trade Practices Act. Therefore, the court granted Chase's motion for a directed verdict on all grounds. On March 27, 2009, the circuit court entered an order reflecting this ruling and dismissed the complaint with prejudice. Minor filed a timely notice of appeal on April 23, 2009.

We have accepted certification of this case from the court of appeals in order to determine the effect of nonwaiver and no-unwritten-modification clauses in a contract when a secured creditor has routinely accepted delinquent payments from a debtor. While we have never considered this specific issue, Arkansas courts have held that, when the contract does not contain the provisions at issue before us now, the creditor's previous acceptance of late payments in the past from the debtor waives the creditor's right to demand strict compliance from the debtor in the future. *See, e.g., Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464 (1998); *Am. Law Book Co. v. Hurst*, 168 Ark. 28, 268 S.W. 605 (1925). This waiver

remains in effect until the creditor notifies the debtor that it will no longer accept late payments, and instead will require strict compliance. *Ellison*, 334 Ark. at 367, 974 S.W.2d at 470. The majority of jurisdictions around the country have adopted this same general rule. *See, e.g., Ford Motor Credit Co. v. Waters*, 273 So.2d 96, 100 (Fla.Dist.Ct.App.1973); *Dunn v. Gen. Equities of Iowa, Ltd.*, 319 N.W.2d 515 (Iowa 1982); *Nev. Nat'l Bank v. Huff*, 94 Nev. 506, 582 P.2d 364 (1978); *Slusser v. Wyrick*, 28 Ohio App.3d 96, 502 N.E.2d 259 (1986); *Lee v. Wood Prods. Credit Union*, 275 Or. 445, 551 P.2d 446 (1976); *Ford Motor Credit Co. v. Washington*, 573 S.W.2d 616 (Tex.Civ.App.1978).

The existence of nonwaiver and no-unwritten-modification provisions in the contract changes the situation, however. As previously mentioned, this court in *Mercedes–Benz Credit Corp. v. Morgan*, 312 Ark. 225, 850 S.W.2d 297 (1993), reserved considering the effect of such clauses. In *Morgan*, Morgan purchased a Porsche with an installment contract assigned to Mercedes–Benz Credit Corporation (MBCC). Morgan made many late payments, and about a year into the forty-eight month contract, MBCC decided to exercise its right to repossess the vehicle under the contract. Morgan then brought his account current, and MBCC offered to return the Porsche, but Morgan refused and filed an action for conversion. On appeal, this court considered Morgan's argument that the fact that MBCC had routinely accepted Morgan's late payments constituted a waiver of strict compliance, and, at the very least, MBCC had to provide notice to Morgan before it repossessed the vehicle. This court noted that its prior decisions in *Commercial Credit Co. v. Ragland*, 189 Ark. 349, 72 S.W.2d 226 (1934), and *General Motors Acceptance Corp. v. Hicks*, 189 Ark. 62, 70 S.W.2d 509 (1934), decided before the adoption of the Uniform Commercial Code, required a creditor, who had accepted late payments in the past, to notify a debtor that the practice would no longer be continued before the creditor could take appropriate action to declare a default. The court then quoted a long passage from Steve H. Nickles's *Rethinking Some U.C.C. Article 9 Problems*, 34 Ark. Law Rev. 1, 136–37 (1980–1981), that indicated that this rule did not change with the adoption of the Uniform Commercial Code. This court concluded that, given this authority, the jury could have found that MBCC had waived its right to repossession by its course of dealing in accepting late payments, and that MBCC would need to provide Morgan with notice in order to reinstate its right to strict compliance.

However, this court noted that MBCC relied on the holding in *Westlund v. Melson*, 7 Ark.App. 268, 647 S.W.2d 488 (1983), that acceptance of a late payment precludes acceleration of the due date of the note because of the lateness of that payment, but is not a waiver for the right to accelerate when default occurs in a subsequent installment. While this court rejected MBCC's argument because MBCC had brought it up for the first time on appeal, the court did not reject the holding in *Westlund* outright. Further, the court sua sponte acknowledged that the contract at issue in the case before it contained nonwaiver and no-unwritten-modification clauses, and seemed to imply that if MBCC had addressed these clauses in its argument, the outcome of the case might have been different.

Accordingly, we affirm our previous decisions that when a contract does not contain a nonwaiver and a no-unwritten-modification provision and the creditor has established a course of dealing in accepting late payments from the debtor, the

creditor waives its right to insist on strict compliance with the contract and must give notice to the debtor that it will no longer accept late payments before it can declare default of the debt. However, we announce today that, if a contract includes nonwaiver and no-unwritten-modification clauses, the creditor, in accepting late payments, does not waive its right under the contract to declare |₁₀default of the debt, and need not give notice that it will enforce that right in the event of future late payments.[2]

In arriving at this conclusion, we adhere to the principle that "a security agreement is effective according to its terms between the parties." Ark.Code Ann. § 4–9–201 (Repl.2001); *Fordyce Bank & Trust Co. v. Bean Timberland, Inc.*, 369 Ark. 90, 97, 251 S.W.3d 267, 273 (2007). We have long held that nonwaiver clauses are legal and valid. *See Philmon v. Mid–State Homes, Inc.*, 245 Ark. 680, 684, 434 S.W.2d 84, 87 (1968) (citing *Johnson v. Guar. Bank & Trust Co.*, 177 Ark. 770, 9 S.W.2d 3 (1928)). Also, section 4–2–209(2) (Repl.2001) of the Arkansas Code declares that no-unwritten-modification provisions are binding.

We acknowledge that there is a difference of opinion among the courts in other jurisdictions over the effect of nonwaiver and no-unwritten-modification clauses. The United States District Court for the District of Connecticut described this split of authority best:

There are three schools of thought on the anti-waiver provision and its effect on the general rule. One line of cases has construed the anti-waiver provision

as giving the secured party the right to take possession of the collateral without notice upon default. *Virgil Van Bibber, et al, v. Norris* [275 Ind. 555], 419 N.E.2d 115 (Ind.1981); *Hale v. Ford Motor Credit Co.*, 374 So.2d 849 (Ala. 1979); *Wade v. Ford Motor Credit Co.*, 455 F.Supp. 147 (D.C.E.D.Mo.1978). In contrast, a second line of cases holds that the anti-waiver clause is irrelevant because acceptance of late payments does not constitute |₁₁a waiver of the secured party's right to demand prompt payments. These jurisdictions have decided that waiver is not the issue to be determined, but rather "the issue is the right of the [debtor] ... to be notified of a modification of such conduct on part of the [creditor]." *Waters*, 273 So.2d at 100. In reaching a determination of this issue, the courts essentially reverted to the general rule concluding that the debtor has the right to be notified of the secured party's demand of prompt payments. "The basis for imposing this duty on the secured party is that the secured party is estopped from asserting his contract rights because his conduct had induced the justified reliance of the debtor in believing that late payments were acceptable." *Cobb*, 295 N.W.2d at 236.

In *Westinghouse* [*Credit Corporation v. Shelton*, 645 F.2d 869 (10th Cir. 1981)], *supra*, the United States Court of Appeals for the Tenth Circuit expressed a third view with respect to the anti-waiver provision. The court concluded that it was possible for the credi-

---

**2.** Before certifying this case to this court, the court of appeals requested that the parties submit letter briefs addressing its recent decision in *Turley v. Staley*, 2009 Ark. App. 840, 372 S.W.3d 821. In that case, involving a contract for the sale of land, the court of appeals found that the acceptance of late payments effected a waiver that remained in

place until the seller notified the buyer otherwise, despite the existence of a nonwaiver clause in the contract. We find *Turley* distinguishable from this case because it involved the sale of real property, and therefore was not a secured transaction governed by Article 9 of the Uniform Commercial Code, as in this case. Ark.Code Ann. § 4–9–109 (Supp.2009).

tor to waive the anti-waiver provision pursuant to basic contract principles as illustrated in Article 2 of the Uniform Commercial Code. *Id.* at 871–74. Arriving at this conclusion, the court reasoned that an Article 9 security agreement may also be a contract for a sale and, therefore, Article 2 principles are applicable. *Id.* at 872 n. 3. The court went on to state that U.C.C. § 2–208 permitted the creditor to waive its right to strictly enforce the contract's terms. *Id.* at 872–73.

*Tillquist v. Ford Motor Credit Co.,* 714 F.Supp. 607, 611 (D.Conn.1989); *see also Smith v. Gen. Fin. Corp. of Ga.,* 243 Ga. 500, 255 S.E.2d 14, 14 (1979) ("[E]vidence of the buyer's repeated, late, irregular payments, which are accepted by the seller, does create a factual dispute as to whether a quasi new agreement was created under Code § 20–116, and a jury question is also raised as to whether the anti-waiver provision in the loan contract was itself waived."); *Battista v. Sav. Bank of Balt.,* 67 Md.App. 257, 507 A.2d 203, 209 (1986) ("We hold, therefore, that a waiver of a contractual right to prompt payment or a waiver of a contractual right to repossess . . . may be effected by conduct, and the same is true as to the provisions of a non-waiver clause. When such a waiver has occurred, the creditor, before it can insist on future performance in strict compliance with the contract, must give plain and reasonable notice to the debtor that it intends to do so."); *Moe v. John Deere Co.,* 516 N.W.2d 332, 338 (S.D.1994) ("We hold that the repeated acceptance of late payments by a creditor who has the contractual right to repossess the property imposes a duty on the creditor to notify the debtor that strict compliance with the contract terms will be required before the creditor can lawfully repossess the collateral.").

By our holding, we have adopted the reasoning of the first line of cases. We concur with the Supreme Court of Indiana's decision in *Van Bibber v. Norris,* 275 Ind. 555, 419 N.E.2d 115 (1981), that a rule providing that nonwaiver clauses could themselves be waived by the acceptance of late payments is "illogical, since the very conduct which the [non-waiver] clause is designed to permit[,] acceptance of late payment[,] is turned around to constitute waiver of the clause permitting the conduct." *Id.* at 121. We also agree that the approach of jurisdictions that require creditors who have accepted late payments in the past to notify debtors that they expect strict compliance in the future, despite the existence of a nonwaiver provision in the contract, is not "sound." *Id.* at 121. Such a rule, we recognize, "begs the question of validity of the non-waiver clause." *Id.* at 121. Finally, our holding is in line with the Indiana Supreme Court's ruling that it would enforce the provisions of the contract, since the parties had agreed to them, and that it would not require the creditor to give notice, because the nonwaiver clause placed the secured party in the same position as one who had never accepted a late payment. *Id.* at 122; *see also Hale v. Ford Motor Credit Co.,* 374 So.2d 849 (Ala.1979); *Gen. Grocer Co. of Ill. v. Bachar,* 51 Ill.App.3d 907, 8 Ill. Dec. 720, 365 N.E.2d 1106 (1977); *First Nat'l Bank of Cincinnati v. Cianelli,* 73 Ohio App.3d 781, 598 N.E.2d 789 (1991).

In holding that nonwaiver and no-unwritten-modification clauses in a contract preclude waiver of a secured creditor's right to demand strict compliance with the contract in the future, even where the creditor's past acceptance of late payments has established a course of dealing, we address only the question certified to us by the court of appeals. We remand this case to the court of appeals for a determination on the merits.

Certified question answered; remanded to court of appeals.

GUNTER and WILLS, JJ., concur.

WILLS, J., concurring.

Although I agree with the answers provided by the majority to the "certified question," I concur for the reasons set forth in my concurring opinion in *Pulaski Choice, L.L.C. v. 2735 Villa Creek, L.P.*, 2010 Ark. 91, 362 S.W.3d 882. As stated therein, I do not believe that our rules or our case law contemplate this court's acceptance of "certified questions" from the court of appeals under the circumstances of this case. I would accept and decide the entire case. Judicial economy is simply not promoted by answering the question posed and then remanding the matter to the court of appeals for further action. Accordingly, I concur.

GUNTER, J., joins.